[Cite as *In re A.N.*, 2017-Ohio-6926.]

STATE OF OHIO              )                    IN THE COURT OF APPEALS
                          )ss:                   NINTH JUDICIAL DISTRICT
COUNTY OF MEDINA          )

IN RE: A.N.                                      C.A. No.      17CA0003-M


                                                APPEAL FROM JUDGMENT
                                                ENTERED IN THE
                                                COURT OF COMMON PLEAS
                                                COUNTY OF MEDINA, OHIO
                                                CASE No.      2015 04 DE 0017


                        DECISION AND JOURNAL ENTRY

Dated: July 24, 2017


TEODOSIO, Judge.

{¶1}    Appellant Mother appeals the judgment of the Medina County Court of Common Pleas, Juvenile Division, that terminated her parental rights to her minor child, A.N., and placed the child in the permanent custody of Medina County Job and Family Services ("JFS"). This Court affirms.

I.

{¶2}    Mother is the biological mother of A.N. (d.o.b. 4/17/15). After four putative fathers were dismissed from the case after genetic testing excluded them, paternity was ultimately established. Immediately thereafter, Father expressed his desire not to pursue a relationship with A.N., moreover declining to participate in case plan services and visitation with the child. Father is not a party to this appeal. Mother is also the biological mother of an older child who was the subject child in another case initiated by JFS, and placed in the legal custody

of a relative;[1] and a son who was conceived and born during the pendency of this case involving A.N. Those children are not subjects of this appeal. To the extent that evidence about them is relevant to this case, they will be referred to as E.W. and D.N., respectively.

{¶3} While the case involving E.W. was pending, Mother gave birth to A.N. Based on ongoing concerns about Mother's lack of appropriate and stable housing; lack of income to meet basic needs for herself and the children; significant history with JFS and her failure to have made substantial progress on her case plan involving E.W.; and consistent and repeated involvement in relationships with sexual offenders, JFS filed a complaint the day the child was born, alleging that A.N. was a dependent child pursuant to R.C. 2151.04(C) and (D). JFS obtained an ex parte emergency order of temporary custody the day A.N. was born. The agency retained emergency temporary custody after a shelter care hearing which Mother attended.

{¶4} At a bifurcated adjudicatory hearing, Mother stipulated to a finding that A.N. was a dependent child pursuant to R.C. 2151.04(C), based on the following stipulated factual basis:

> Child was born April 17, 2015. Mother's housing i[s] unstable. She currently resides with her biological mother, [ ] who has extensive children's services history including substantiated allegations of physical abuse and neglect and had her parental rights to mother terminated. Mother indicated she intends to move to Wooster with a new boyfriend. New boyfriend, [R.B.], has extensive children's services history, including being the alleged perpetrator in substantiated physical and sexual abuse cases, and criminal history with convictions for cruelty to animals and disorderly conduct as well as numerous eviction actions. Mother has substantial children's services history regarding child's sibling involving concerns of homelessness, county hopping, residing with individuals who pose a risk to her child and an inability to meet the basic needs of her child. Child's sibling has been adjudicated dependent and is currently in the temporary custody of Medina County Job and Family Services. Mother has not made substantial progress on the case plan services in her open case. Mother does not have safe, stable housing and is unemployed and cannot support herself or a newborn solely on community resources. Paternity has not been established. One putative father is a registered sex offender whose victim was a minor female and the other putative father is a

---

[1] This Court recently affirmed the award of legal custody. *In re E.W.*, 9th Dist. Medina No. 16CA0052-M, 2017-Ohio-5623.

sexually oriented offender recently convicted of failing to register. Child is scheduled to be released over the weekend. The newborn is young and unable to self-protect if left in the care and custody of mother.

{¶5} The adjudicatory hearing was continued as to Father. Once paternity was established, Father also stipulated that the child was dependent pursuant to R.C. 2151.04(C). The agency dismissed the allegations of dependency pursuant to R.C. 2151.04(D).

{¶6} At the dispositional hearing, Mother and Father agreed that the child should be placed in the temporary custody of JFS. The juvenile court further adopted the agency's proposed case plan as the order of the court. Through counsel, Father indicated his desire not to seek reunification with the child or participate in case plan services.

{¶7} Eleven months into the case, JFS filed a motion for a six-month extension of temporary custody. The agency asserted that Mother was making some progress on her case plan objectives, although she still had issues she needed to address. At the hearing on the motion, the parties agreed to a first six-month extension of temporary custody. A few months later, however, JFS filed a motion for permanent custody, asserting that the child had been in the temporary custody of the agency for 12 or more of the past 22 months, or, in the alternative, that the child could not be placed with a parent within a reasonable time or should not be returned to any parent. The agency further delineated multiple reasons why it believed that it was in A.N.'s best interest to be placed in the permanent custody of JFS.

{¶8} The matter proceeded to hearing on the agency's motion for permanent custody. No other parties had filed any dispositive motions. When the court inquired immediately prior to the hearing whether any party had additional motions for the court's consideration, Mother's attorney asserted that Mother had none. During Mother's opening statement, however, counsel asserted that Mother was requesting an additional six months in which to continue to work on her

case plan objectives. The juvenile court held Mother's oral request for a six-month extension of temporary custody in abeyance pending its determination regarding the agency's motion for permanent custody. The parties presented their respective cases in chief, and the guardian ad litem for the child submitted his written report and responded to questioning by the court and counsel. At the conclusion of the hearing, the trial court permitted the parties to submit written briefs in lieu of closing arguments.

{¶9} The juvenile court granted the agency's motion for permanent custody and terminated the parents' parental rights regarding A.N. Mother filed a timely appeal in which she raises two assignments of error for review.

II.

ASSIGNMENT OF ERROR I

THE TRIAL COURT ERRED IN FINDING THAT MEDINA COUNTY JOB AND FAMILY SERVICES USED REASONABLE EFFORTS IN REUNIFYING MOTHER AND A.N. AFTER MEDINA COUNTY JOB AND FAMILY SERVICES DEPRIVED MOTHER OF HER DUE PROCESS RIGHTS BY SUSPENDING VISITATION BETWEEN MOTHER AND A.N. WITHOUT COURT APPROVAL.

{¶10} Mother argues that the agency's suspension of her visitation with A.N. in the absence of a properly amended case plan negated reasonable efforts by JFS towards reunification, thereby depriving her of due process. This Court disagrees.

{¶11} From January until May 2016, and again from late June through July 2016, Mother's visitations with the child, as well as her participation in intensive parenting classes, were suspended due to an infestation of bed bugs in Mother's apartment and the high risk of cross-contamination. In addition, Mother left the area to work with a traveling carnival during the summer, voluntarily foregoing her ability to visit with the child. During these time periods, JFS requested and obtained a first six-month extension of temporary custody. There is nothing

in the record to indicate that Mother objected, either in writing or at any review hearing, to the agency's suspension of her visitation until the bed bug issues were resolved. Moreover, despite numerous references by multiple witnesses during the permanent custody hearing that Mother's visitation was suspended for several months due to the bed bug infestations, Mother never objected or otherwise raised the issue that the agency had not used reasonable efforts to facilitate reunification or that she had thereby been deprived of due process. Neither did she raise these issues in her written closing brief to the juvenile court.

{¶12} This Court has previously held:

> To the extent that Mother challenges the trial court order on broad constitutional grounds, Mother is barred from bringing such a challenge on appeal due to her lack of objection in the trial court. This Court need not reach constitutional challenges that were not timely raised before the trial court.

*In re N.L.*, 9th Dist. Summit No. 27784, 2015-Ohio-4165, ¶ 51, citing *In re O.T.*, 9th Dist. Summit No. 24403, 2009-Ohio-1055, ¶ 12.

{¶13} In addition, Mother never objected to the agency's policy of suspending visitations when a parent's home is infested with bed bugs, and never argued that the agency should have facilitated alternative means for her to maintain contact with the child. Nor did she make any argument below that JFS had failed to use reasonable efforts to facilitate her reunification with the child. Accordingly, we need not consider the merits of her challenge on appeal. *See In re M.C.*, 9th Dist. Summit Nos. 27116, 27117, 2015-Ohio-1627, ¶ 28.

{¶14} Finally, Mother has not alleged plain error. While this Court has yet to determine whether the civil or criminal plain error standard applies to cases involving the termination of parental rights, we need not do so in this case. *See In re J.S.*, 9th Dist. Summit Nos. 28342, 28344, 2017-Ohio-75, ¶ 9, citing *In re D.S.*, 9th Dist. Summit No. 24619, 2009-Ohio-3167, ¶ 10. As Mother failed to make a plain error argument on appeal, we decline to undertake such an

analysis on her behalf. *See State v. Bowerman*, 9th Dist. Medina No. 13CA0059-M, 2014-Ohio-4264, ¶ 16. To the extent that Mother asserts that suspension of her visitation was prejudicial because it foreclosed the juvenile court's consideration of the child's relationship with Mother, we disagree. Mother herself voluntarily suspended visitation with the child for a period of time when she chose instead to spend time with a boyfriend and work with a traveling carnival. As Mother voluntarily chose to forego visitation with A.N. during the pendency of this case in order to pursue other opportunities, she cannot now be heard to claim prejudice arising out of the agency's suspension of visitation due to concerns regarding cross-contamination of pests.

{¶15} Mother's first assignment of error is overruled.

ASSIGNMENT OF ERROR II

THE TRIAL COURT'S DECISION TO PLACE THE CHILD IN THE PERMANENT CUSTODY OF MEDINA COUNTY JOB AND FAMILY SERVICES, RATHER THAN TO GRANT AN ADDITIONAL SIX-MONTH EXTENSION OF TEMPORARY CUSTODY WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, AND NOT IN THE BEST INTERESTS OF THE CHILD.

{¶16} Mother argues that the juvenile court's finding that permanent custody of A.N. to JFS was in the best interest of the child was against the manifest weight of the evidence. This Court disagrees.

{¶17} In considering whether the juvenile court's judgment is against the manifest weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new [hearing] ordered." (Internal quotations and citations omitted.) *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. When weighing the

evidence, this Court "must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21.

{¶18} Before a juvenile court may terminate parental rights and award permanent custody of a child to a proper moving agency, it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned; orphaned; has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; the child or another child of the same parent has been adjudicated abused, neglected, or dependent three times; or that the child cannot be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D)(1). R.C. 2151.414(B)(1) and 2151.414(B)(2); *see also In re William S.*, 75 Ohio St.3d 95, 98-99 (1996). Clear and convincing evidence is that which will "produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." (Internal quotations omitted.) *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368 (1985), quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶19} The juvenile court found that the first prong of the permanent custody test was satisfied because A.N. had been in the temporary custody of JFS for at least 12 of 22 consecutive months. Mother does not challenge that finding; rather, she solely challenges the finding that permanent custody is in the best interest of the child.

{¶20} When determining whether a grant of permanent custody is in a child's best interest, the juvenile court must consider all the relevant factors, including those enumerated in R.C. 2151.414(D)(1): the interaction and interrelationships of the child, the wishes of the child, the custodial history of the child, the child's need for permanence and whether that can be

achieved without a grant of permanent custody, and whether any of the factors outlined in R.C. 2151.414(E)(7)-(11) apply. R.C. 2151.414(D)(1)(a)-(e); *see also In re R.G.*, 9th Dist. Summit Nos. 24834, 24850, 2009-Ohio-6284, ¶ 11.

Father

**{¶21}** As to Father, the evidence established that he has abandoned the child. R.C. 2151.414(E)(10). He requested through counsel that he be removed from the case plan, as he did not wish to seek reunification. He never visited with the child and did not participate in the case after stipulating to the child's dependency at the adjudicatory hearing.

Mother

**{¶22}** Mother focuses much of her argument on her case plan objectives: how the agency crafted them to "doom [her] to failure[,]" and how the juvenile court minimized Mother's compliance and embraced her inevitable loss of custody. In so arguing, Mother addresses the agency's alternative ground, and only one of the trial court's findings, regarding the first prong of the permanent custody case, to wit: that the child cannot or should not be placed with Mother, specifically because she failed to substantially remedy the problems that initially caused the child to be removed from the home. *See* R.C. 2151.414(B)(2) and (E)(1). However, this Court has repeatedly recognized that the factors delineated in R.C. 2151.414(B) are alternative findings, any one of which satisfies the first prong of the permanent custody test. *In re E.M.*, 9th Dist. Wayne No. 15CA0033, 2015-Ohio-5316, ¶ 12, quoting *In re S.G.*, 9th Dist. Wayne No. 15AP0005, 2015-Ohio-2306, ¶ 11; *see also In re G.D.*, 9th Dist. Summit No. 27855, 2015-Ohio-4669, ¶ 18, 22 (concluding that because "only one first-prong finding must be sustained in order to support the judgment[,]" any argument that an alternative first-prong finding was erroneous is moot).

{¶23} Here, Mother concedes that the child was in the temporary custody of JFS for 12 or more months of a consecutive 22-month period. R.C. 2151.414(B)(1)(d). She moreover concedes that this finding satisfies the first prong of the permanent custody test and that she "limits her challenge to the trial court's finding that permanent custody was in the best interest of A.N." Accordingly, her challenge to the juvenile court's alternative first-prong finding that the child cannot be placed with either parent within a reasonable time or should not be placed with a parent is moot. To the extent that Mother's case plan compliance is relevant to the best interest factors, this Court will address those issues in due course.

**Interaction and interrelationships of the child**

{¶24} The first best interest factor requires the juvenile court to consider the "interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child[.]" R.C. 2151.414(D)(1)(a).

{¶25} JFS took custody of A.N. upon her birth due to ongoing concerns that Mother was unable to provide a safe and stable environment for the child. Accordingly, A.N. has never resided with Mother, and has only had contact with Mother during supervised 2-hour weekly visitations when Mother was able or chose to participate in visitations. Mother's visitations were suspended by the agency during two periods totaling approximately five months when Mother's home was infested with bed bugs and she posed a risk of cross-contamination. Mother also voluntarily suspended her visitation with the child when she worked for a traveling carnival during the summer of 2016.

{¶26} Although Mother testified that she and A.N. have a strong relationship and interact well, multiple professionals testified to the contrary. Mother's Help Me Grow

coordinator, her caseworker, and the child's guardian ad litem all expressed concerns about Mother's inability to multitask and mind the child while talking with service providers. On multiple occasions, Mother failed to notice that A.N. had wandered away while she discussed matters with the service providers. Once, the Help Me Grow coordinator had to catch the child as she was about to fall off a slide, because Mother had not noticed that the child was in danger. The guardian ad litem reported that he believed that Mother's interaction with the child had actually gotten worse in recent weeks before the hearing, because Mother was more focused on trying to convince him that her current boyfriend did not pose a threat, than on interacting with the child. The guardian also observed that the child appeared more content playing by herself than with Mother. The professionals involved in the case all expressed concerns that Mother was too harsh with the child and used non-age-appropriate techniques in her efforts to discipline A.N. Specifically, Mother would yell at the child or block her path, rather than attempt to redirect the child's attention in a manner she could understand.

{¶27} The foster mother testified that the 18-month old child had been in her home for the past seven months. Although there was a "rough transition" during the first month, the child had acclimated well and was well bonded with both foster parents and their 9-year old son. In addition, the foster mother has coordinated visits between the child and her older sister with E.W.'s legal custodian. The guardian reported that the girls play well together and will be enjoying regular visits with one another. As Mother voluntarily gave custody of D.N. to that child's paternal grandmother, A.N. has not developed a relationship with her infant brother.

**Wishes of the child**

{¶28} The second best interest factor requires consideration of the "wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child[.]" R.C. 2151.414(D)(1)(b).

{¶29} Due to her young age, the child did not express her wishes regarding custody. The guardian ad litem recommended an award of permanent custody to JFS both in his written report and when questioned during the hearing.

**Custodial history of the child**

{¶30} The third best interest factor requires consideration of the child's custodial history, including whether she has been in the temporary custody of CSB for 12 or more months of a consecutive 22-month period. R.C. 2151.414(D)(1)(c).

{¶31} Within days of her birth, A.N. was released from the hospital and immediately placed with a foster family, where her needs were adequately met. When JFS sought a first six-month extension of temporary custody, the foster family informed the agency that they were not able to care for the child during the possible extension period. JFS transferred placement of the child into another foster home, where she remained at the time of the hearing. Accordingly, A.N. has never resided with Mother or any other family member. She is a well-adjusted, healthy child who is well bonded with her foster family, in whose home her needs are being met. There was no evidence regarding whether the current foster parents were willing to adopt the child, although they hold foster-to-adopt licenses. No relatives who are willing and/or appropriate to have custody of the child have been identified. The child had been in the temporary custody of JFS in excess of 12 of 22 consecutive months at the time of the hearing.

**The child's need for a legally secure permanent placement; less restrictive options**

**{¶32}** The fourth best interest factor requires the juvenile court to consider the child's "need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency[.]" R.C. 2151.414(D)(1)(d).

**{¶33}** Mother had been involved with JFS for approximately two years at the time of the permanent custody hearing regarding A.N. JFS initiated this case in large part because Mother had not shown much progress on her case plan objectives regarding E.W., and had not been able to demonstrate that she could provide a safe and stable environment for children. Mother's case plan involving A.N. mirrored the same concerns and objectives in her prior case involving E.W. Accordingly, Mother had been working on those objectives for two years without substantial progress.

**{¶34}** Under the terms of the case plan, Mother was required to (1) maintain safe, stable, secure housing; (2) provide verification of income sufficient to meet the child's basic needs; (3) attain emotional stability to provide for the needs of the child by consulting with a psychiatrist regarding her bipolar disorder diagnosis, being compliant with medication requirements, participating in weekly or biweekly counseling as available, and participating in dialectic behavioral therapy to address anger management concerns; (4) complete an intensive parenting program; (5) engage in an approved money management program and demonstrate the ability to properly manage finances to obtain self-sufficient housing and provide for the basic needs of herself and the child; and (6) participate in case management services, including following recommendations; signing releases; notifying the agency of all changes in housing, employment, and other relevant matters; securing and maintaining a sober, appropriate support system; securing safe, stable, and appropriate housing; and meeting the child's basic needs.

Housing

{¶35} Mother had obtained subsidized housing just over a year earlier and had recently executed a month-to-month lease at the time of the hearing. Mother paid $0 rent based on income, and also received a utilities subsidy. Despite the subsidy, Mother's electricity was disconnected for non-payment in September 2016, because Mother used the money for other things.

{¶36} Mother repeatedly violated the provisions of her lease, thereby putting her housing in jeopardy, by allowing unauthorized persons and animals to reside in her apartment. Specifically, Mother allowed her own biological mother to move in with her, even though her mother had lost custody of Mother as a child based on Mother's victimization of physical abuse by her mother and sexual abuse by her mother's boyfriends. Moreover, Mother allowed her mother to move in at a time when her mother's own apartment was infested with bed bugs, leading to a second infestation of bed bugs in Mother's apartment. Mother was not very cooperative in attempting to eradicate the bed bugs in her apartment on either occasion, making the apartment uninhabitable for the child for a total period of approximately five months. On other occasions, Mother allowed various men to move into her apartment, including a sex offender who failed to register that address and was subsequently arrested, and a man she met and brought home from a bar and who then refused to leave. When Mother finally succeeded in making the man from the bar leave after two weeks, her apartment was burglarized by someone she believed to be that man. Mother was required to pay to have the locks on her apartment changed as a result.

{¶37} Despite having an apartment of her own, Mother was staying with her current boyfriend in his trailer on the weekends. That boyfriend is a convicted sex offender who

committed gross sexual imposition involving a 12-year old girl. Nevertheless, Mother hoped to live with her boyfriend, with the child, as a family.

{¶38} Mother had no furnishings in her apartment until shortly before the hearing due to the bed bug infestations. She had obtained a crib and possibly a mattress by that time.

Income and employment

{¶39} Throughout the 18-month pendency of the case, Mother was "largely unemployed" with some "scattered jobs," none of which lasted more than two months at a time. Three months before the hearing, Mother left with her boyfriend to work with a traveling carnival for a month. She did not visit with the child during that time. Mother got pregnant with her third child and did not work for much of that pregnancy, except when traveling with the carnival. At the time of the hearing, Mother testified that she had recently started two jobs in the past week-and-a-half. She claimed to be working part-time at McDonald's three days a week, and part-time at a diner on the weekends. Neither the caseworker nor the guardian ad litem could verify Mother's employment, and Mother could not provide any proof of her asserted new income. Although she claimed to be working, she had not notified the subsidized housing office of her income and explained that she did not plan to do so until she had been able to save some money.

Mental health

{¶40} Mother began seeing a therapist at Solutions Behavioral Healthcare in November 2014, to address issues relevant to her custody case involving E.W., specifically issues of chemical dependency, mental health problems with anxiety and depression, parenting issues, relationship issues with significant others, and anger management. Mother had been treating with her therapist for two years and was reported to engage well and be open to learning how to

change her behavior. Although the therapist testified that Mother self-reported that she was using the techniques she had learned to manage her anger well and make progress in her ability to parent, the therapist had not independently verified these claims. During the permanent custody hearing, Mother demonstrated that she had not fully assimilated anger management techniques, when she interrupted during the agency's opening statement that she was leaving. She then "stomp[ed] out" of the courtroom, "slam[ming] the door" behind her. When Mother returned to the courtroom, the court cautioned her against being disruptive. On other occasions, Mother interjected while other witnesses were testifying.

{¶41} The Solutions therapist, whose qualifications included certification in sex offender counseling, raised a significant concern regarding Mother's habitual relationships with sex offenders, including her current boyfriend. The therapist would frequently discuss the impact that Mother's current relationship has on her situation. Although Mother indicated during therapy that she recognized she had made bad choices regarding past relationships, Mother continued to assert that her current boyfriend posed no danger to her daughter, despite his conviction for gross sexual imposition against a 12-year old girl. Even during her own testimony, Mother admitted that she had made many past mistakes by engaging in dangerous relationships with multiple sex offenders. However, she referred to her current boyfriend as a victim, who along with three other "victimized" adult males, was duped into engaging in sexual activity by a 12-year old. Mother's therapist testified that this behavior is indicative of Mother's pattern of eventually recognizing that she is in an unhealthy relationship, terminating that relationship, but moving on to another unhealthy relationship with a different sex offender.

{¶42} In May 2015, Mother submitted to a parenting evaluation with a psychologist at Northeast Ohio Behavioral Health ("NEOBH") to determine her ability to parent children

generally. As part of the parenting evaluation, the psychologist rendered several diagnoses for Mother, including: (1) bipolar disorder (characterized by episodes of depression, irritability, extreme energy, lack of impulse control, and other mood swings) with psychosis (characterized in Mother's case by visions of "spirits" or colors around people), (2) dependent personality disorder, (3) borderline personality disorder, (4) reactive attachment disorder (impacting the level of commitment or attachment one can develop with others and manifesting in superficial or exploitative relationships), and (5) borderline intellectual functioning. Mother's IQ of 80 indicated that she functioned in a below average range for intellectual ability, i.e., she is capable of learning but with difficulties, and requires greater structure and repetition in order to grasp concepts.

{¶43} The psychologist acknowledged that parenting evaluations are generally only valid for a year, but she explained that medically-based mental health disorders, like bipolar disorder, and IQ remain consistent. At most, bipolar disorder can be managed with medication to stabilize moods and psychoses. In addition, developmental disorders like reactive attachment disorder will generally be pervasive and not easily changed, although modification is more likely to succeed if treatment is received before the age of six. On the other hand, personality disorders may be modified with counseling, so those assessments for Mother may no longer be valid. Based on Mother's evaluation at the time, the psychologist recommended, among other things, that Mother participate in a psychiatric evaluation; weekly or biweekly counseling to address the challenging aspects of her personality; anger management or a more focused dialectal behavioral therapy to address her impulse control issues; and an intensive parenting program. One of the psychologist's major concerns was Mother's demonstrated lifestyle choice to engage repeatedly in romantic relationships with drug users, sexual abusers, physical abusers, and other criminal

actors. The NEOBH psychologist was not aware whether or not Mother participated in any treatment or services regarding these concerns.

**{¶44}** In August 2015, Mother submitted to a psychiatric evaluation and pursued ongoing treatment with a psychiatrist at Solutions. The doctor diagnosed her with cycling mood disorder consistent with bipolar disorder, as well as posttraumatic stress disorder which gave rise to borderline personality disorder. In addition, he noted that Mother had a history of alcohol abuse/dependence and psycho-stimulant (Adderall) abuse.

**{¶45}** The psychiatrist described bipolar disorder as a chronic mental illness and mood disorder in which the patient cycles between depression and mania, the latter evidenced by over-energized states of irritability or elevated mood, impulsivity, and recklessness. He testified that Mother's borderline personality disorder likely arose out of childhood trauma, including physical and verbal abuse by her mother, and repeated sexual abuse by men brought into her life. The doctor prescribed lithium and Invega to manage Mother's bipolar disorder. A month later Mother was not yet responding well to the medications because she was continuing to use alcohol. Over the next two months, Mother was stable and not experiencing abnormal mood states. In December 2015, however, Mother stopped taking her medications because she was pregnant. Her psychiatrist acknowledged the significant risks associated with taking lithium during pregnancy, but asserted that Invega was probably safe, although it too posed some risks. In any event, he did not fault Mother for refusing to take either medication during her pregnancy or while nursing. However, both the caseworker and Mother testified that Mother self-medicated with marijuana during her pregnancy. Mother asserted that her obstetrician gave her permission to use marijuana during the last couple months of her pregnancy because she was having trouble

eating. According to Mother, her doctor told her, "As long as you don't do it for very long, it's fine."

{¶46} Mother did not appear for another appointment with her psychiatrist for seven months, at which time the psychiatrist terminated that appointment because (1) Mother had not been taking her medications for an extended period of time, and the doctor could not properly assess her, and (2) Mother was in active labor with her third child. At her next appointment, the doctor cautioned Mother about relapsing, but she continued to refuse to take her medications. The next month, the psychiatrist refused to prescribe the anti-anxiety/tranquilizing medications Mother requested in lieu of lithium and Invega, because those types of medications are contraindicated for people with a history of substance/alcohol abuse. Mother, therefore, terminated her treatment and sought psychiatric services at Alternative Paths. Mother did not ask Alternative Paths to obtain her records from her psychiatrist at Solutions. In his conclusion, the psychiatrist at Solutions testified that he does not believe that Mother has good insight into her bipolar disorder, its effects on her life, or the necessary treatment to manage it.

{¶47} Mother appeared for an intake assessment with a counselor at Alternative Paths two months before the permanent custody hearing. Without having Mother's prior records, the counselor diagnosed her with (1) major depressive disorder, based in part on Mother's assertions that she thinks about suicide "all the time," and (2) generalized social phobia. The counselor recommended psychiatric services, counseling, and participation in group therapy to improve social skills. Although Mother requested some services including an appointment with a psychiatrist, the counselor did not know if she had followed through. Mother interjected, "I was sick." Even so, she produced two bottles of medications (Gabapentin and Buspirone) at the hearing, but she did not explain what conditions or symptoms they were used to treat.

{¶48} Mother's prior psychiatrist testified that he disagreed with some diagnoses rendered by Mother's counselors, but he explained that was not unusual because a counselor's diagnosis is symptom-based, rather than disorder-based. He clarified that symptoms do not constitute valid diagnoses, and emphasized that proper medications are necessary to manage Mother's bipolar disorder and prevent ongoing relapse.

Intensive parenting program

{¶49} Mother has been engaged with two service providers regarding parenting concerns. Mother's current Help Me Grow caseworker assessed her and determined that Mother genuinely cares for A.N. In addition, Mother was implementing the lessons regarding child development. Nevertheless, despite Mother's involvement with Help Me Grow for three years, the caseworker maintained concerns regarding Mother's abilities to focus the necessary attention on the child to keep her safe, and to provide appropriate discipline that the child could understand. The Help Me Grow caseworker testified that, despite some progress by Mother, ongoing intervention for the foreseeable future was still warranted. Indeed, the caseworker expressed concerns regarding the child's development and Mother's parenting abilities if Help Me Grow were no longer involved with the family. Moreover, the caseworker testified that Mother was months away from being ready to step down from weekly services to biweekly services, and that another six months of consistent progress at the biweekly level would be necessary to step down to monthly services.

{¶50} Mother was also engaging in an intensive parenting program at NEOBH since April 2016. However, her participation was suspended on both occasions when her apartment was infested with bed bugs. Although Mother has been cooperative, her counselor expressed grave concerns regarding Mother's lifestyle choices involving relationships with sex offenders.

Mother has not been receptive to the counselor's attempts to work with her to establish a safe, secure, and stable environment for the child. As part of the intensive parenting program, Mother was required to research sex offenders and recidivism. Nevertheless, she has gained no insight and remains unable to ascertain the safety risks that a child sex offender poses to her child. In fact, Mother informed the guardian ad litem that she was sure that her current boyfriend would not reoffend based on her research and observations of him with a friend's child who came to visit for an hour. Specifically, Mother asserted that her boyfriend had not engaged in any grooming behaviors with that child. When the guardian disagreed and reiterated that maintaining a relationship with a sex offender poses a risk to her child, Mother got upset and asked, "Don't I deserve to be happy?"

{¶51} Despite repeated explanations and cautions by counselors, the caseworker, and the guardian ad litem about the dangers Mother's relationships with sex offenders, including her current boyfriend, pose to the child, Mother demonstrated her inability to assimilate that information and break the cycle of moving from one harmful relationship to another. In an attempt to show that she has developed insight, however, Mother testified, "I can tell you now that most of my relationships, besides the one I'm in, ha[ve] been bad." Mother then described how E.W.'s father was verbally abusive and forced her to have sex when she did not want it. When she "started noticing those signs as signs that [she] didn't want around [her] child," she ran off with another man. She also described a relationship with a man who is now serving up to 125 years in prison for multiple rapes of a child as "an idiotic, stupidity decision" which almost cost her her children and her life. Nevertheless, Mother continued to inform others and testify in court that her current child-sex-offender-boyfriend poses no danger, as he was a victim of both a

12-year old girl and a system that rushed him to judgment. Mother hopes to live with her current boyfriend and her children as a family.

Money management programs/financial independence

{¶52} Despite referrals, Mother has not completed an approved money management program. She has attended some money management classes in her apartment building, but she has not received a certificate of completion. Mother has not been able to demonstrate that she is able to provide financially for herself, let alone any child. The JFS caseworker voiced ongoing concerns regarding Mother's financial stability based on Mother's expressed desire to leave her rent-free apartment and move into her boyfriend's trailer, which would obligate her to pay $200 per month for rent. The caseworker explained that Mother does not even earn $200 per month. Another concern was that, although Mother received an ongoing utilities subsidy, as well as cash assistance payments of several hundred dollars in both July and August 2016, Mother lost utility services when she failed to pay for those, and additionally failed to use her cash assistance to pay court fines and expenses associated with eradicating the bed bugs from her home. Mother could not explain to the caseworker where the money that was provided or put away for those specific expenses went.

{¶53} Mother's case manager at Medina County Child Support Enforcement Agency ("CSEA") testified that Mother has a monthly child support obligation of $200.05 that appears to cover both E.W. and A.N. Although CSEA records indicate that Mother has paid a small amount towards her obligation, she maintained an arrearage of $2,789.26 as of the date of the hearing. While Father, who has had no contact with the child and has not participated in any case planning services, had a credit on his child support obligation for the child.[2]

---

[2] Father's monthly child support obligation was $251.44.

Case management services

**{¶54}** Although Mother signed releases and met monthly with the JFS caseworker, she did not notify the agency regarding significant changes, like her contact with police after her apartment was robbed and her decision to change mental health providers from Solutions to Alternative Paths. In addition, despite transportation provided by the agency, Mother missed or rescheduled some appointments. Otherwise, Mother was cooperative and compliant with case management services.

## Applicability of R.C. 2151.414(E)(7)-(11) factors

**{¶55}** The fifth best interest factor requires consideration of whether any of the factors in R.C. 2151.414(E)(7)-(11) are applicable. R.C. 2151.414(D)(1)(e).

**{¶56}** Father has abandoned the child. R.C. 2151.414(E)(10). None of these factors are applicable to Mother.

## Conclusion

**{¶57}** The record demonstrates that this is not a case where the juvenile court clearly lost its way and created a manifest miscarriage of justice in finding that it was in the best interest of A.N. to be placed in the permanent custody of JFS. *See Eastley*, 132 Ohio St.3d 328, 2012-Ohio-2179, at ¶ 20. There is an abundance of clear and convincing evidence regarding the ongoing threat to the child's safety, security, and stability arising out Mother's failure to maintain habitable housing, consistent employment, and financial stability; as well as her lack of insight regarding her mental health issues, the relationships she repeatedly cultivates with sex offenders, and the dangers facing a child who may likely be exposed to a parade of sex offenders. Mother jeopardizes her subsidized housing by repeatedly violating the terms of her lease by allowing others, including criminals, to reside with her. Her income is sporadic and

inadequate to provide for herself and the basic needs of a child. Despite subsidies and other cash assistance, Mother's electricity was shut off for lack of payment, and she used money intended to eradicate a bed bug infestation for other things for which she could not account. Mother has not tried to manage her bipolar disorder reasonably and diligently, instead self-medicating with an illegal substance (marijuana) and seeking a doctor who will prescribe drugs that are contraindicated because of information she did not disclose. Moreover, although Mother professed to recognize that she had made very bad decisions regarding past relationships with men who were abusers and sex offenders, she refused to or simply could not recognize that her current paramour, who was convicted of gross sexual imposition against a 12-year old girl, presented the same threat of harm to her children. Mother was subjected to these same conditions as a child, and has adopted the same patterns of conduct demonstrated by her own mother, with no indication that she will gain the necessary insight to modify her behaviors in the foreseeable near future. Father has abandoned the child. The best interests of the child demand that she not be subjected to the risk of harm, instability, and lack of safety and security. Accordingly, the juvenile court's award of permanent custody of A.N. to JFS was not against the manifest weight of the evidence. Mother's second assignment of error is overruled.

## III.

{¶58} Mother's assignments of error are overruled. The judgment of the Medina County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Medina, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

_____
THOMAS A. TEODOSIO
FOR THE COURT

CALLAHAN, J.
CONCUR.

CARR, P. J.
CONCURRING IN JUDGMENT ONLY.

{¶59} I concur in judgment only. I would overrule Mother's first assignment of error solely on the basis that she did not object to the agency's suspension of her visitation while her apartment was infested with bed bugs. I would not construe her argument to raise any constitutional issues that had to be preserved in the trial court. Moreover, Mother has not demonstrated that the two periods of suspension of her visitation prejudicially impacted the juvenile court's decision. Rather, Mother's interaction with the child was only one of many factors considered by the juvenile court.

{¶60} As to Mother's second assignment of error, I concur that the juvenile court's award of permanent custody of A.N. was not against the manifest weight of the evidence, and that such an award was in the child's best interest.

APPEARANCES:

DANA H. GARDNER, Attorney at Law, for Appellant.

JENNIFER A. MOORE, Attorney at Law, for Appellee.

MICHAEL D. DAILEY, Attorney at Law, Guardian ad litem, for Appellee.