# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## BELMONT COUNTY

IN RE: J.H., DEPENDENT CHILD.

---

**OPINION AND JUDGMENT ENTRY**
Case No. 25 BE 0013

---

Juvenile Appeal from the
Court of Common Pleas, Juvenile Division
of Belmont County, Ohio
Case No. 23 JC 384

**BEFORE:**
Carol Ann Robb, Cheryl L. Waite, Katelyn Dickey, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Martin S. Hume*, Martin S. Hume Co., L.P.A, for Appellant and

*Atty. J. Kevin Flanagan,* Belmont County Prosecutor*, Atty. Jacob A. Manning,* Assistant Prosecuting Attorney, for Appellee.

Dated: June 26, 2025

**Robb, P.J.**

{¶1}   Appellant C.H. (the mother) appeals the decision of the Belmont County Common Pleas Court, Juvenile Division, which terminated her parental rights and granted permanent custody of J.H. (the child) to Appellee Belmont County Department of Job and Family Services (BCDJFS) after concluding it was in the child's best interest and the child cannot be placed with the mother within a reasonable time.   The mother raises six assignments of error addressing the following subjects:  the propriety of venue in Belmont County for a child born to an incarcerated mother when this was the county sentencing her to prison; sufficiency of the notice in the permanent custody motion; lack of counsel at the emergency shelter care hearing; sufficiency and weight of the evidence to support the judgment; ineffective assistance of counsel; and cumulative error.  For the reasons expressed hereunder, the juvenile court's judgment is affirmed.

<u>STATEMENT OF THE CASE</u>

{¶2}   After being indicted in Belmont County, the mother pled guilty to two fourth-degree felonies, attempted failure to comply with an order or signal of a police officer (after amendment of the charge) and receiving stolen property (motor vehicle), along with two first-degree misdemeanor attempted theft counts (after amendment).  On March 27, 2023, she was sentenced to 30 months in prison after consecutive 15-month prison terms were imposed on the felonies (with 46 days of jail time credit through the sentencing date). The sentencing entry mentions her pregnancy.  She began serving her prison term at the Ohio Reformatory for Women in Marysville, Ohio on April 4, 2023.

{¶3}   From prison, the mother worked with BCDJFS to search for a placement for her expected child since she would give birth in prison.  She reported the father was unknown.  On August 26, 2023, she gave birth to J.H.  The location of the birth was reported as the Ohio State Medical Center in Columbus, Ohio.  The child was released two days later into the emergency shelter care of a caseworker from BCDJFS.  (8/30/23 Tr. 13).  The caseworker ensured a complaint was filed with the juvenile court the next day pursuant to statute.

<u>Case No. 25 BE 0013</u>

{¶4} This August 29, 2023 dependency complaint filed in Belmont County by BCDJFS requested temporary custody or protective supervision. Attempts to secure placement of the child with the mother's family and friends were attested therein. In addition to disclosing the aforementioned charges resulting in the mother's imprisonment, the complaint noted the mother was convicted in 2022 of two drug-related misdemeanors of the first degree (attempted drug possession and possessing drug abuse instruments).[1] The complaint also pointed to the mother's West Virginia loss of permanent custody of a different child who was later adopted.

{¶5} The juvenile court held an emergency shelter care hearing two days after the caseworker received the child. The court read the complaint to the mother, who appeared remotely from prison without counsel. (8/30/23 Tr. 2-6). The court appointed counsel for the mother, named a guardian ad litem for the child, and set the hearing date for the requested dependency adjudication and temporary custody. (8/30/23 J.E.); (8/31/23 J.E.). The court found continued shelter care was required pending that hearing while pointing out the mother consented to the shelter care finding. The court pointed to the reasonable efforts made by the agency including case management, kinship placement, and home studies. (8/31/23 J.E.).

{¶6} The first report from the guardian ad litem said the mother was not due to be released from prison until August 2025. (10/12/23 GAL). The case plan addressed the mother's negative impact on her children due to her legal troubles, her history of drug use, and her inconsistent use of mental health or drug services, while noting her drug use caused her loss of custody of another child.

{¶7} At the adjudicatory hearing, the mother appeared remotely from prison represented by counsel. The mother admitted the child was dependent and agreed with the temporary custody disposition. (10/13/23 Tr. 3-6). The resulting dependency judgment granted temporary custody to BCDJFS and approved the case plan. (10/17/23 J.E.).

---

[1] The offense of possessing drug abuse instruments involves a "hypodermic or syringe" that has been used to administer, use, or prepare a dangerous drug, other than marijuana, and is a misdemeanor of the first degree only when the offender has a prior conviction for a drug abuse offense. R.C. 2925.12(A),(C).

**{¶8}** The second guardian ad litem report stated the criminal court denied the mother's first motion for judicial release. It was reported the mother was involved in the programs available to her in prison. (2/7/24 GAL). Continued efforts to find a relative were discussed at the first review hearing. (2/14/24 Tr. 4).

**{¶9}** The third guardian ad litem report stated the criminal court denied the mother's second motion for judicial release. It was opined her earliest release date would be July 10, 2025. (4/30/24 GAL).

**{¶10}** At the next review hearing, a discussion occurred about the need to make decisions on the child's future due to the passage of time and the hindrance to reunification by the mother's continued incarceration. The juvenile court opined the mother would not obtain judicial release after the two prior denials. The mother spoke about hoping to enroll in college in June 2024 and thereby secure release to a halfway house in January 2025. She also said she was still trying to find a kinship placement. (5/8/24 Tr. 2-7).

**{¶11}** On July 25, 2024, BCDJFS filed a motion for permanent custody, attaching exhibits in support of various statements. The motion noted the mother was a Belmont County resident, who was incarcerated in the Maryville prison when she gave birth to the child. As grounds, the motion stated the child cannot be placed with either parent within a reasonable time, citing R.C. 2151.414(B)(1)(a) (and noting the time period in the 12 of 22 option had not yet occurred). It was pointed out the criminal court denied the mother's third motion for judicial release (on July 16, 2024), and her expected release date was July 10, 2025. (Ex. B-C). It was also alleged the mother had additional felony matters pending in West Virginia that would be addressed after her release from Ohio incarceration. (Ex. D). The permanent custody motion said the mother takes the classes available to her but waitlists were long and she was unable to complete a case plan with any true meaning. (Ex. A). It was pointed out BCDJFS made multiple efforts to find a relative placement both before and after the child's birth. The child's best interests were discussed, including integration with the foster family, who was willing to provide a permanent home.

**{¶12}** The guardian ad litem's fourth report made note she recently became aware of the mother's pending charges in West Virginia. It was opined the mother uses her time

wisely in prison. However, it was opined permanent custody was in the child's best interest. (8/12/24 GAL). At the next case review hearing, the mother's continued incarceration and the West Virginia issues were discussed, and it was pointed out a permanent custody hearing was scheduled. (8/14/24 Tr. 2-7).

{¶13} The fifth guardian ad litem report restated prior information and noted the mother longed to parent her child but was unable to bond with the child due to her incarceration. The opinion that permanent custody was in the child's best interest was reiterated after reviewing some factors. (8/23/24 GAL).

{¶14} At the originally scheduled permanent custody hearing, the court was informed the mother intended to voluntarily surrender her parental rights permanently. (8/29/24 Tr. at 3). The proceedings were thus continued so documents could be prepared for the mother's review and signature and then presented to the court. (8/30/24 J.E.).

{¶15} However, the mother filed a motion requesting the appointment of new counsel, which was followed by a motion to withdraw from her attorney. The mother said she felt manipulated into saying she would voluntarily relinquish her parental rights; she said her attorney suggested she would lose if she fought the case but relinquishing this child could benefit her in future proceedings involving any other children. (9/9/24 Mot.). After a hearing, the court denied the mother's motion but granted counsel's motion to withdraw and appointed a new attorney. (9/12/24 J.E.).

{¶16} A status conference was held where the exchange of discovery was confirmed and the parties agreed they were prepared to move forward on the permanent custody hearing. (10/9/24 J.E.). The permanent custody hearing subsequently proceeded on October 29, 2024.

{¶17} An adoption case manager at BCDJFS testified about her involvement with the mother from May 2023 (when she was contacted by the prison social worker) through August 2023 (when the child was born and an intake case manager took over). (Tr. at 4-14). She confirmed her prenatal attempts to find a placement for the child, making inquiries about at least six families whose names were provided by the mother. For instance, the mother's grandmother was 91 years old and resided in a nursing home. The couple who adopted the mother's older child declined unless adoption was certain.

Case No. 25 BE 0013

Another potential placement said the same. The mother's half-sister declined to foster the child. Two friends were ruled out after investigations.

{¶18} The adoption case manager also identified her case notes and a summary outlining the notes, which she testified was accurate. (Ex. 1-2). In addition, she identified a letter in which she requested records from West Virginia about the mother's other child and the responsive judgment entry showing the mother's parental rights were terminated by a court in West Virginia on September 16, 2021 (when that child was 12 years old). The entry said the mother appeared late at a prior hearing, requested a continuance, and then failed to appear at the rescheduled hearing, where her attorney was present. It also said that child's father abused and neglected the child and had no contact for many years thereby abandoning her. (Ex. 3). The adoption case manager noted the mother claimed to believe she could still work on having that child returned to her and was unaware the child was subsequently adopted.

{¶19} The second witness was the intake case manager at BCDJFS, who testified about her involvement after the child was placed in emergency shelter care, noting the mother was in prison throughout the agency's involvement in the case. (Tr. 15-26.). She looked into additional names provided by the mother after the child's birth. She met with the mother every month (alternating between live and virtual meetings). She explained the case plan goals: counseling, parenting classes, finding future employment and housing, and becoming able to provide for the child in a safe environment. (Ex. 5). She said the mother completed the requirement of parenting classes and worked transferring calls in prison, noting the mother believed she could work remotely at this same job after her release.

{¶20} The mother's Belmont County sentencing entry was identified by this witness. (Ex. 6). She said the mother's original release date was in August 2025 but the mother hoped to get out earlier. This caseworker also confirmed the mother's loss of custody of her other child in West Virginia and opined the Department of Rehabilitation and Corrections (DRC) found her ineligible for the prison nursery program due to this prior termination of parental rights. She also noted there were no visits with the child from prison and no opportunity for bonding. She explained the child's foster family wished to adopt the child and opined permanent custody was in the child's best interest. The intake

caseworker identified her case notes and a summary of the notes, attesting to their accuracy. (Ex. 1, 4).

**{¶21}** The child's guardian ad litem testified to her recommendation of granting permanent custody to BCDJFS due to mother's continued incarceration and the lack of a bond with the child. (Tr. 27-30). She recognized the mother could be released at the end of June 2025 with good time but pointed out this date could change depending on behavior. She was concerned that even if the mother was released in June, this would provide little time for bonding. She pointed out the pending West Virginia charges also made the overall release date unknown. The guardian ad litem was therefore also concerned about the mother's housing prospects on release. She also discussed the child's foster family, who treated him like a biological child and wished to adopt him, pointing out the family's adopted child had become the subject child's "older brother."

**{¶22}** The mother testified about her plans. (Tr. 31-34). She believed she would maintain the reported early release date at the end of June 2025, which was eight months from the permanent custody hearing date. She claimed to have hopes of being released even earlier into a halfway house (stating she was "pushing for a TC"). She explained her job was remote for a candy company and said other inmates retained their job at that company after their release. The mother said 80% of her pay is placed in a savings account for use upon her release. She planned to "apply" for housing when she was released, stating she was not sure if she could do so while incarcerated. She also said she wanted to buy a trailer and rent property for it, stating she has been researching locations. The mother said she engaged in some counseling and continues to take parenting classes.

**{¶23}** Lastly, when asked if she believe it was in the best interest of the child that permanent custody be granted to the agency as requested, the mother answered: "So, in my heart I want my child back. After hearing what everybody has to say it's not good that he's living in a foster home. And the fact that he has an older brother and everything I would probably have to say yeah, it's in his best interest right now, yes." (Tr. 34). The prosecutor representing BCDJFS accordingly chose not to cross-examine the mother. After admitting the exhibits without objection, the court filed the exhibits into the docket and took the matter under advisement. (10/29/24 J.E.); (Ex. 1-6).

Case No. 25 BE 0013

**{¶24}** On October 31, 2024, the court issued a judgment granting permanent custody to BCDJFS. The court reviewed the testimony, including the mother's final acknowledgement on the child's best interest. The court found the clear and convincing evidence showed the child cannot be placed with the mother within a reasonable time, as alleged in the permanent custody motion, under R.C. 2151.414(B)(1)(a). It was pointed out a finding under this ground was required if the court found by clear and convincing evidence the existence of one of the factors in division (E). The court then found the existence of three different factors. Additionally, the court reviewed the best interest factors in division (D) and concluded permanent custody was in the child's best interest.

**{¶25}** The mother's appeal was found timely due to a service issue, and new counsel was thereafter appointed. The mother's brief was filed on May 19, 2025. This opinion is issued expeditiously as required by App.R. 11.12(C).

ASSIGNMENT OF ERROR ONE

**{¶26}** The mother's brief sets forth six assignments of error, the first of which alleges:

"THE JUVENILE COURT ABUSED ITS DISCRETION BY EXERCISING JURISDICTION OVER THIS CASE, AS BELMONT COUNTY WAS NOT A PROPER VENUE FOR THE ACTION."

**{¶27}** The mother emphasizes she resided at a prison in Maryville, Ohio (Union County) at the time of the child's birth. She also alternatively points to the dependency complaint indicating the child's place of birth was reported as a hospital in Columbus, Ohio (Franklin County). It is argued the record does not show a relevant residence would provide venue in Belmont County. Claiming Belmont County was merely the venue imposing her prison sentence (after her local pretrial incarceration), she suggests BCDJFS overlooked the fact that the Belmont County criminal case listed her address as Wheeling, West Virginia. Due to these facts and based on her reading of a statute and a corresponding juvenile rule, the mother concludes the case should have been filed in Union or Franklin County.

**{¶28}** As the mother acknowledges, the Supreme Court explained the cited venue provisions are not jurisdictional and rests within the juvenile court's discretion to remedy any venue issue and transfer the case. *In re Z.R.*, 2015-Ohio-3306, ¶ 13-29. We

Case No. 25 BE 0013

emphasize neither her original attorney, who represented her for a year, nor her replacement attorney, who tried the case, objected to the venue. BCDJFS urges any objection to venue was waived. *See Wilson v. Brown*, 2002-Ohio-2410, ¶ 14 (7th Dist.) (venue is a procedural matter relating to the convenience of litigants who must assert it to avoid waiver).

**{¶29}** Recognizing this failure to raise venue below, the mother suggests the juvenile court committed a plain error. Plain error is an error that "seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself." *In re E.M.J.*, 2023-Ohio-3605, ¶ 58 (7th Dist.), citing *Goldfuss v. Davidson*, 79 Ohio St.3d 116 (1997), syllabus (reserving plain error in a civil case for "the extremely rare case involving exceptional circumstances"). Even in a criminal case, the Supreme Court emphasizes plain error is a discretionary doctrine the appellate court may choose to employ only with the utmost care in exceptional circumstances when required to avoid a manifest miscarriage of justice after finding the defendant demonstrated an obvious error that affected the trial outcome. *State v. Noling*, 2002-Ohio-7044, ¶ 62; *see also State v. Rogers*, 2015-Ohio-2459, ¶ 22 ("required to demonstrate a reasonable probability that the error resulted in prejudice—the same deferential standard for reviewing ineffective assistance of counsel claims").

**{¶30}** Likewise, the mother argues her attorney(s) rendered ineffective assistance of counsel in failing to object to venue in Belmont County; she raises this here and in her fifth assignment of error (where she raises various allegations of ineffective assistance of counsel). We incorporate the law and analysis from that assignment of error here. As further analyzed below, an ineffective assistance of counsel argument requires a demonstration of deficient performance and prejudice from the lack of objection. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In claiming prejudice, the mother says if venue had been transferred, then the child would have been fostered closer to the prison for possible visits and this would have avoided the situation of the same prosecutor's office acting against her in both her juvenile and her criminal cases.

**{¶31}** The cited law says a person with knowledge of a child who appears to be an abused, neglected, or dependent child may file a complaint "in the juvenile court of the

county in which the child has a residence or legal settlement or in which the . . . abuse, neglect, or dependency allegedly occurred." R.C. 2151.27(A)(1); *accord* Juv.R. 10(A). Yet, it also says if the child is taken into custody pursuant to division (A) or (D) of R.C. 2151.31 without the filing of a complaint and placed into shelter care pursuant to division (C), then "a sworn complaint shall be filed with respect to the child before the end of the next day after the day on which the child was taken into custody." R.C. 2151.27(A)(1)[2]; *see also* Juv.R. 11(A) (providing transfer is optional if the child resides in a county other than the county in which the proceeding was commenced or the child's residence changes).

{¶32} The BCDJFS caseworker took custody of the child via ex parte emergency shelter care the day before the complaint was filed as permitted by R.C. 2151.31(A), (C), and (D). The complaint stated the mother gave birth during her imprisonment and explained the caseworker was an employee of BCDJFS, providing the Belmont County address for the agency. Moreover, the mother fails to discuss the applicable regulations authorized by statute. *See, e.g.,* R.C. 5120.652 (authorizing the Department of Rehabilitation and Correction to promulgate rules for implementation of the prison nursery program); R.C. 5153.166 (authorizing the adoption of rules governing public children services agencies).

{¶33} In accordance with R.C. 5120.652, DRC's regulation for the prison nursery program specifies the eligibility for housing newborns with their incarcerated mothers. Adm.Code 5120-9-57(C). In doing so, the regulation discusses ineligibility and its consequences:

> For all infants born to inmates who are ineligible for the prison nursery program, Ohio children services boards or county departments of human services which have assumed the administration of children services functions prescribed by Chapter 5153. of the Revised Code are responsible for investigating and recommending placement arrangements or arranging placements for infants born to inmates. The rules governing these functions

---

[2] For the determination of any other matter over which the juvenile court has jurisdiction under R.C. 2151.23, anyone with standing may file a complaint "in the county in which the child who is the subject of the complaint is found or was last known to be." R.C. 2151.27(D); *accord* Juv.R. 10(A).

are promulgated by the Ohio department of job and family services (rules 5101:2-42-60 and 5101:2-42-61 of the Administrative Code).

Adm.Code 5120-9-57(I).

{¶34} If an inmate in DRC's custody is pregnant, the prison must notify an institutional parenting coordinator. Adm.Code 5120-9-57(K)(2). If the inmate may remain incarcerated for the expected delivery date, the parenting coordinator shall ascertain the inmate's state and county of residence when sentenced, the county in Ohio where the inmate was sentenced, and the inmate's preferred placement plan. *Id.* If the inmate was an Ohio resident at the time she was sentenced, the parenting coordinator shall then notify her resident county of certain information listed in the statute. Adm.Code 5120-9-57(K)(3)(a)-(K) (name, social security number, prior address, committing county, father's name and address, financial resources, parole or release date, expected delivery date, baby placement choice and alternative placement, name and phone number of "referring" case manager/parenting coordinator, and return address of institution).

{¶35} Most notably, "In the event that the inmate was not an Ohio resident at the time that she was sentenced, the case manager/parenting coordinator shall provide the same notification to the public children[] services agency in the county having jurisdiction of the case in which the inmate was last convicted and sentenced." Adm.Code 5120-9-57(K)(3). Thereafter, the parenting coordinator will inform the inmate "of the approval or rejection by the responsible children[] services agency of the inmate's placement plan." Adm.Code 5120-9-57(K)(4).[3]

{¶36} If DRC medical personnel order the inmate transferred to a hospital, the hospital shall be notified "of the agency identified in paragraph (K)(3) of this rule and shall take such other action necessary to effectuate the purpose of this rule." Adm.Code 5120-9-57(K)(5). Only "[i]n the event that the agency identified in paragraph (K)(3) of this rule communicates its inability to assume custody and care of an infant, the case manager/parenting coordinator shall request intervention by the public children[] services agency in the county in which the child is hospitalized." Adm.Code 5120-9-57(K)(6).

---

[3] The DRC regulation contains a typographical error "childrens services" in division (K) of Adm.Code 5120-9-57 instead of "children services" as used in divisions (F) through (I).

**{¶37}** Additionally, the prison "shall establish procedures for providing assistance in the placement of infants who are born to inmates ineligible for the prison nursery program." Adm.Code 5120-9-57(J). "Such procedures shall include provisions for the coordination of services with hospitals and state and local children services agencies." *Id.*

**{¶38}** Finally, as authorized under R.C. 5153.166, a DJFS regulation (cited in the above block-quoted DRC regulation) provides similarly after explaining: "Public children services agencies (PCSA) are responsible for establishing policies and procedures for service coordination with correctional facilities and hospitals on behalf of infants born to women who are incarcerated." Adm.Code 5180:2-42-60(A), renumbered (eff. 1/2/25) from former 5101:2-42-60. "Upon notification by the correctional facility that postnatal services will be needed, the PCSA in the county in which the woman was a resident at the time of incarceration, *or if not an Ohio resident, the PCSA in the county in which the woman was charged or sentenced* shall" perform various listed functions. (Emphasis added.) Adm.Code 5180:2-42-60(B) (such as obtaining temporary custody of the infant by agreement or court order if the infant is not remaining with the mother in prison, the mother did not recommend a caregiver, or a caregiver's approval is not recommended after an assessment). *Id.* In fact, where the woman was not an Ohio resident at the time of her incarceration, "the PCSA in the county in which the woman was charged or sentenced" is statutorily labeled, "the PCSA of jurisdiction" (and is distinguished from the PCSA in the county of the child's hospitalization at birth). Adm.Code 5180:2-42-60(B)-(F).

**{¶39}** Accordingly, the mother has not demonstrated the court abused its discretion or committed plain error in proceeding with the case as venued in Belmont County. Likewise, her trial attorneys were not ineffective in failing to object to venue in Belmont County; the failure to raise venue was not deficient and there was not a reasonable probability the argument would have succeeded. This assignment of error is overruled

**{¶40}** As an additional observation, the ultimate prejudice she asserts with regards to her prison location not being near the agency or foster location was a situation resulting from her circumstances of being sentenced to prison and the agency caseworker

following the law regarding the mother giving birth and being ineligible for the prison nursery. Lastly, we make an observation on her other claim of prejudice (from the failure of counsel to assert the venue issue or the failure of the juvenile court to sua sponte raise it).

**{¶41}** The mother says her juvenile case was prejudiced by being venued in Belmont County due to a Prof.Cond.R. 1.7 conflict of interest involving her criminal case. She points to the state's opposition to her (third) motion for judicial release filed in the criminal case prior to the agency's filing of the permanent custody motion in the juvenile case at bar. However, the existence and contents of this opposition constitute evidence outside of the record, which we are prohibited from considering in this appeal. *See State v. Hartman*, 93 Ohio St.3d 274, 299 (2001) (cannot rely on items outside of the record to prove facts or to show a deficiency in representation or a resulting prejudicial impact); *State v. Ishmail*, Ohio St.2d 402, 406 (1978) (appellate court is limited to what transpired as reflected by the record on direct appeal).

**{¶42}** To the extent the mother is claiming there was necessarily a prejudicial conflict of interest where the same prosecutor's office worked on a criminal case against a defendant and on a juvenile dependency/permanent custody action where that defendant is the parent, this is a common occurrence built into the state's system of government. The mother says the office of the prosecutor's first client (the state in the criminal case) had a conflict with its second client (the agency in the juvenile case) because such agency had a legal obligation to work toward reunification. She does not discuss the fact that the obligations of the agency nevertheless include the filing of a permanent custody motion when warranted. The interests of the clients here are not comparable to those in the case she cites. *See In the Matter of J.W.*, 2018-Ohio-2020, ¶ 1 (11th Dist.) (where the attorney who prosecuted the permanent custody motion for DJFS was the same attorney originally appointed to represent the mother in the same juvenile case, the appellate court issued a limited 15-day remand for the juvenile court to determine if there was an actual conflict of interest due to the clear possibility of a conflict the juvenile court knew or should have known about); *see also In the Matter of J.W.*, 2018-Ohio-2475, ¶ 68 (11th Dist.) (agreeing with the juvenile court's finding of no actual conflict of interest).

{¶43} In addition, the assistant prosecutor who represented BCDJFS throughout the juvenile case was not the same individual whose name is on the sentencing entry from the mother's criminal case (which was placed into evidence at the permanent custody hearing) or whose name is on the entry denying judicial release (which was attached to the permanent custody motion). Along these lines, the record does not show the prosecutor's office lacks a system of operation whereby the prosecutor or assistant prosecutor working on criminal cases is "screened" from the assistant prosecutor in the department working on a related juvenile abuse, neglect, and dependency action. *See* Prof.Cond.R. 1.0(c) (where the definition of "firm" does not include the prosecutor's office), (l) (defining screen); *see also* Prof. Cond.R. 1.11(d)(1) (citing 1.7), Comment (2) ("division (d) does not impute the conflicts of a lawyer currently serving as an officer or employee of the government to other associated government officers or employees, although ordinarily it will be prudent to screen such lawyers"). For the various reasons expressed above, the venue argument is without merit.

ASSIGNMENT OF ERROR TWO

{¶44} The mother's second assignment of error contends:

"THE JUVENILE COURT ERRED BY GRANTING THE ORDER OF PERMANENT CUSTODY TO BCDJFS ON GROUNDS DIFFERENT FROM THOSE ALLEGED IN THE MOTION SEEKING PERMANENT CUSTODY."

{¶45} The mother emphasizes the termination of parental rights is "the family law equivalent of the death penalty" entitling the parent to all procedural and substantive legal protections. *In re C.W.*, 2004-Ohio-6411, ¶ 23. The mother refers to due process principles supporting the following notice requirement applicable to a motion for permanent custody: "An application to the court for an order shall be by motion . . . It shall state with particularity the grounds upon which it is made. Juv.R. 19 (and the motion "shall be supported by a memorandum containing citations of authority and may be supported by an affidavit").

{¶46} She points to a case finding a prayer for permanent custody deficient (under a former statute) for not "sufficiently apprising the parents of the grounds on which the order is to be based . . ." *In re Fassinger*, 42 Ohio St.2d 505 (1975), syllabus. Distinguishably, the Court found the service of summons on the original dependency

complaint had a statutory notice deficit and the subsequent motion for permanent custody contained no ground at all, merely saying it was in the child's best interest. *Id.* at 506-508 (all under former law when the prayer for permanent custody was to be by complaint as well, before the motion option was enacted). The mother also quotes the Supreme Court's interpretation of the more recent statute: "A juvenile court lacks authority to grant an agency's motion on R.C. 2151.414(B)(1)(d) grounds if those grounds were not satisfied when the motion was filed." *In re C.W.* at ¶ 24 (speaking of the "12 of 22" ground, which was not utilized here).

**{¶47}** The mother claims the juvenile court announced three "grounds" for granting permanent custody and contends two of these "grounds" were not alleged in the motion for permanent custody. However, she cites to the "factor[s]" in division (E)(1), (11), and (13), which the court found were supported by clear and convincing evidence. She acknowledges the permanent custody motion sufficiently raised allegations under (E)(1) (notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home). Nevertheless, she complains the motion did not contain an allegation under (E)(11) (parental rights were involuntarily terminated as to the child's sibling) and (E)(13) ("parent is repeatedly incarcerated" which prevents the provision of care for the child).

**{¶48}** The mother's argument conflates the factors in division (E) with the "grounds" for a permanent custody motion. *See In re Lucas*, 29 Ohio App.3d 165, 170 (3d Dist. 1985). Juv.R. 19 deals with grounds for a motion in a case where the action is already filed. *Compare* R.C. 2151.27(A)(1) (stating the dependency *complaint* "shall allege the particular facts upon which the allegation that the child . . . is [a] . . . dependent child is based"). As can be seen in the language employed in the Supreme Court case she cites, it is division (B)(1) that contains the "grounds" for a permanent custody motion. *In re C.W.*, 2004-Ohio-6411, ¶ 22-27.

**{¶49}** Briefly, those grounds are: (a) cannot be placed with parents within a reasonable time or should not be, (b) abandoned, (c) orphaned, (d) temporary custody for 12 of 22 consecutive months, (e) three separate adjudications of this child or other

child in parent's custody. R.C. 2151.414(B)(1)(a)-(e). The juvenile court found the ground in (B)(1)(a) was established by clear and convincing evidence.

{¶50} In contrast, division (E) essentially contains alternative "factors" for determining whether the court is *required* to conclude the (B)(1)(a) ground exists. *See* R.C. 2141.414(B)(1)(a) (applicable in the absence of the other (B)(1) grounds). That is, before listing the factors, division (E) states: "If the court determines, by clear and convincing evidence, at a hearing . . . that one or more of the following exist as to each of the child's parents, the court *shall* enter a finding that the child *cannot be placed with either parent within a reasonable time* or should not be placed with either parent." (Emphasis added.) R.C. 2151.414(E).

{¶51} Notably, the court may make a finding under the (B)(1)(a) ground even in the absence of one of (E)'s specifically described factors. R.C. 2151.414(E) ("shall consider all relevant evidence" to make a determination on whether the child cannot be placed with the parent within a reasonable time based on all evidence), (16) ("[a]ny other factor the court considers relevant"). We also point out (E)(11) is specifically listed as one of the best interest factors to be considered, along with any other factor the court finds relevant. R.C. 2151.414(D)(1) ("In determining the best interest of a child . . . the court shall consider all relevant factors, including, but not limited to"), (D)(1)(e) ("Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child").

{¶52} We therefore reject the mother's position that (E) contains the "grounds" for the motion. The juvenile court found the clear and convincing evidence showed the child cannot be placed with the mother within a reasonable time under R.C. 2151.414(B)(1)(a), which was the ground alleged in the permanent custody motion (and some reasons for this ground were discussed in the motion as well). The court did not rule on a ground that was not alleged in the motion.

{¶53} Again, in ruling on the asserted ground, the juvenile court pointed out its finding under (B)(1)(a) was *required* if the court found by clear and convincing evidence the existence of one of the factors in division (E) and then found the existence of three alternative factors, citing subdivisions (1), (11), and (13). The mother's citations do not support the contention that the permanent custody motion must allege the contents of all

Case No. 25 BE 0013

potentially relevant division (E) factors (just as the contents of each best interest factor under division (D) need not be detailed in the motion).

**{¶54}** Even under the mother's construction of the requirements for setting forth the grounds, unlike the case she cites, the case at bar does not involve a deficiency on the face of the permanent custody motion. *Compare In re Fassinger*, 42 Ohio St.2d 505 (at a time when a summons would have been required and the initial complaint was lacking content as well).[4] It is undisputed BCDJFS's motion for permanent custody contained *reasons* based on the (E)(1) factor supporting the *particular ground* alleged under division (B)(1)(a) of R.C. 2151.414.

**{¶55}** Even assuming the Supreme Court would adopt the mother's argument equating a reason or factor with the required Juv.R. 19 notice ("state with particularity the grounds"), *the mother does not contest the sufficiency of the notice in the permanent custody motion with regards to the factor in (E)(1)* (which she frames as the "ground" for the motion). The *sufficiency of the evidence* to support the three division (E) findings made by the juvenile court is addressed separately in assignment of error four.

**{¶56}** As discussed thereunder, even if a juvenile court alternatively rules on a "ground" that was not alleged in the motion or not supported by the evidence, *there is no prejudice or the issue is moot if one of the grounds relied upon by the court was alleged and supported. See, e.g., In the Matter of A.P.*, 2024-Ohio-741, ¶ 18-19, 43-44, 49, 54-55 (10th Dist.) (sufficiency of the evidence on a (B)(1) ground or a factor under (E) is moot and non-prejudicial where other grounds supported or not challenged); *In re S.W.*, 2019-Ohio-2068, ¶ 35 (3d Dist.) (moot); *In re: A.N.*, 2017-Ohio-6926, ¶ 22-23 (9th Dist.) (moot); *In re C.C.*, 2012-Ohio-1291, ¶ 23 (12th Dist.) (non-prejudicial); *In re R.H.*, 2011-Ohio-6749, ¶ 13-14 (9th Dist.) (non-reversible, lack of prejudice); *In re Franklin*, 2006-Ohio-4841, ¶ 16 (3d Dist.) (harmless error); *see also In re J.M.*, 2014-Ohio-3561, ¶ 11-13 (7th

---

[4] We also note the dependency complaint raised the allegation of the mother's permanent loss of custody in West Virginia of another child, who was thereafter adopted. At that time, BCDJFS decided to seek only temporary custody, instead of permanent custody, which allowed the mother time to attempt her initial judicial release motions. The mother admitted the allegations of the complaint, and the court's dependency order therefore found the complaint's allegations to be established by clear and convincing evidence. (10/17/23 J.E.). It has been concluded that uncontested allegations in a complaint forming the basis of a dependency adjudication can be considered by the juvenile court when later ruling on permanent custody. *In the Matter of J.P.*, 2024-Ohio-4916, ¶ 65 (10th Dist.); *see also In re Cavender*, 2001 WL 27745 (12th Dist. Mar. 19, 2001) (in granting permanent custody, court can take judicial notice of evidence from dependency hearing in the same case), citing Evid.R. 201(C).

Dist.) (actual knowledge satisfied the statutory notice requirement and waiver applied); *In re K.G.*, 2014-Ohio-266, ¶ 16-18 (5th Dist.) (the parent had sufficient notice where the motion asserted an unsupportable "12 of 22" ground but also contained allegations indicating abandonment was a potential basis for permanent custody).

{¶57} Nevertheless, we make some final observations on the permanent custody motion's notice regarding (E)(11) and (E)(13). The permanent custody motion specifically cited division (E)(11). As explained, the statute lists (E)(11) (parental rights involuntarily terminated as to the child's sibling) as a best interest factor in (D) and also lists it as a factor requiring a finding of the (B)(1)(a) ground. R.C. 2151.414. Although the citation was at the end of a paragraph discussing the child's best interest, it was nonetheless specifically cited in the motion. Since the permanent custody motion made no mention of the fact of her prior termination of parental rights, the mother's argument would be that a statutory citation is insufficient notice of the (E) factor supporting the ground in (B)(1)(a).

{¶58} Notably, the dependency complaint raised the allegation of the mother's permanent loss of custody in West Virginia of another child who was thereafter adopted. At that time, BCDJFS decided to seek only temporary custody, instead of permanent custody, which allowed the mother time to attempt her initial judicial release motions. The mother admitted the allegations of the complaint, and the court's dependency order therefore found the complaint's allegations to be established by clear and convincing evidence. (10/17/23 J.E.). It has been concluded that uncontested allegations in a complaint forming the basis of a dependency adjudication can be considered by the juvenile court when later ruling on permanent custody. *In the Matter of J.P.*, 2024-Ohio-4916, ¶ 65 (10th Dist.); *see also In re Cavender*, 2001 WL 277245 (12th Dist. Mar. 19, 2001) (in granting permanent custody, the court can take judicial notice of evidence from the dependency hearing in the same case), citing Evid.R. 201(C).

{¶59} Lastly, on the notice topic, the permanent custody motion specifically cited the factor in (E)(12), which states: "The parent is incarcerated at the time of the filing of the motion for permanent custody or the dispositional hearing of the child and will not be available to care for the child for at least eighteen months after the filing of the motion for permanent custody or the dispositional hearing." R.C. 2151.414(E)(12). In support, the motion alleged with particularity the mother had additional felony matters pending in West

Virginia, opined she would not be released from incarceration within 18 months, and attached the West Virginia indictment and a judgment staying the trial of the case pending her Ohio release. (7/25/24 Mot., Ex. D). Although the motion used these allegations to support the citation to (E)(12), the juvenile court specifically found the existence of these facts as part of the basis for its finding under (E)(13) (parent is repeatedly incarcerated).[5] The mother's notice argument does not mention (E)(12), essentially proceeding as if the motion's citation to it necessarily limits the alleged facts to that specific division.

**{¶60}** In any event, there is no dispute regarding sufficiency of the notice on the ground in (B)(1)(a) or on the supporting factor in (E)(1). Again, the sufficiency of the evidence on each (E) factor is raised in assignment of error four. In sum, the motion for permanent custody sufficiently provided notice of the ground in (B)(1)(a) of R.C. 2151.414. In accordance, this assignment of error is without merit.

ASSIGNMENT OF ERROR THREE

**{¶61}** The mother's third assignment of error alleges:

"THE JUVENILE COURT ERRED BY DEPRIVING THE APPELLANT OF HER CONSTITUTIONAL RIGHT TO COUNSEL AND PROCEEDING WITH A CRITICAL HEARING PRIOR TO THE APPOINTMENT OF COUNSEL."

**{¶62}** At the emergency shelter care hearing two days after the caseworker took emergency custody, the court read the dependency complaint to the mother, who appeared remotely from prison without counsel. (8/30/23 Tr. 2-6). The court explained the hearing on dependency would be scheduled where a disposition could include temporary custody, and the case could later evolve to the potential termination of parental rights. *Id.* at 7-8. The court advised the mother of the right to have counsel appointed if she could not afford to hire one and ascertained her wish to be appointed counsel to represent her at the next hearing. *Id.* at 9. The court named the attorney to be appointed and indicated the court was moving forward with the hearing. When the court asked if she consented to a shelter care finding or if she was seeking a hearing on a shelter care

---

[5] It is possible the juvenile court's citation to (E)(13) (repeatedly incarcerated) was a typographical error intending to refer to (E)(12), which was alleged in the permanent custody motion. Immediately after citing (E)(13), the court observed in a footnote: "The mother of the child is currently incarcerated and testimony established that after the mother serves her current sentence . . . she, in all likelihood, will have to address serious charges that are now pending against her in the State of West Virginia which could result in further incarceration." (10/29/24 J.E.).

issue, the mother answered, "I consent." *Id.* 10. The court pointed out the standard at a hearing would have been whether there was probable cause on the shelter care issues (such as the child was dependent, shelter care was necessary, and there was no person to provide care). *Id.* at 10, 12 (while noting the relaxed rules of evidence).

**{¶63}** On appeal, the mother says she was entitled to counsel before the court proceeded with the emergency shelter care hearing. The right to counsel is not a constitutional right. *In re Miller*, 12 Ohio St.3d 40, 41 (1984) ("There is no constitutional requirement that appellant be afforded counsel at temporary custody proceedings"). However, Ohio law provided a right to counsel. For instance, the mother cites a juvenile rule:

> Assistance of Counsel. Every party shall have the right to be represented by counsel and every child, parent, custodian, or other person in loco parentis the right to appointed counsel if indigent. These rights shall arise when a person becomes a party to a juvenile court proceeding. This rule shall not be construed to provide for a right to appointed counsel in cases in which that right is not otherwise provided for by constitution or statute.

Juv.R. 4(A).

**{¶64}** The mother also cites a statute providing the child's parent "is entitled to representation by legal counsel *at all stages* of the proceedings under this chapter . . ." (Emphasis added.) R.C. 2151.352 (with exceptions for certain actions). "If a party appears without counsel, the court shall ascertain whether the party knows of the party's right to counsel and of the party's right to be provided with counsel if the party is an indigent person." *Id.* "The court may continue the case to enable a party to obtain counsel, to be represented by the county public defender or the joint county public defender, or to be appointed counsel upon request pursuant to Chapter 120. of the Revised Code." *Id.*

**{¶65}** The mother therefore concludes the court erred in failing to ensure she was knowingly, voluntarily, and intelligently waiving her right to counsel at the emergency hearing. She cites a Supreme Court case, which held: "When the state seeks to terminate a parent's parental rights, the parent has the right to counsel. The parent cannot be deprived of that right unless the court finds that the parent has knowingly waived the

right to counsel. Waiver of counsel cannot be inferred from the unexplained failure of the parent to appear at a hearing." *In re R.K.*, 2018-Ohio-23, syllabus (only the syllabus garnered a majority vote). The cited *R.K.* case involved the actual hearing on the termination of parental rights where the juvenile court allowed the mother's attorney to withdraw merely because the mother failed to appear at the permanent custody hearing, instead of insisting her attorney continue representation through the hearing despite her absence (or continuing the hearing for the appointment of new counsel). *Id.*

**{¶66}** Here, the court was faced with an informal and emergency shelter care hearing, which was required to be held as soon as possible after the initial ex parte shelter care obtained by the caseworker. R.C. 2151.314(A) ("informal . . . shelter care hearing held promptly, not later than seventy-two hours after the child is placed in . . . shelter care, to determine whether detention or shelter care is required"). The statute further provides:

> Reasonable oral or written notice of the time, place, and purpose of the detention or shelter care hearing shall be given to the child and, if they can be found, to the child's parents, guardian, or custodian . . . Prior to the hearing, the court shall inform the parties of their right to counsel and to appointed counsel or to the services of the county public defender or joint county public defender, if they are indigent . . . and of the name and telephone number of a court employee who can be contacted during the normal business hours of the court to arrange for the prompt appointment of counsel for any party who is indigent.

R.C. 2151.314(A) (and release the child unless it appears from the hearing that shelter care is required); *see also* Juv.R. 7(F).

**{¶67}** The statutory language indicates the juvenile court is to proceed with the shelter care hearing regardless of whether any written notice arrived in time. *Id.* Furthermore, the same division provides, "If a parent . . . has not been so notified *and did not appear* or waive appearance at the hearing, upon the filing of an affidavit stating these facts, the court shall rehear the matter without unnecessary delay." (Emphasis added.). *Id.* Even where the parent did not receive notice or appear for the emergency hearing, the juvenile court must proceed to render a decision on shelter care, and there is no issue

to be raised unless such parent files an affidavit (or a motion to release the child from shelter care). It has thus been concluded the failure to request a rehearing asserting the lack of counsel at the shelter care hearing waives the argument on appeal. *In re Careuthers*, 2001 WL 458681 (9th Dist. May 2, 2001)

**{¶68}** Questions regarding the effect of not having counsel at the emergency hearing were never brought to the juvenile court's attention while the mother was represented by counsel in the more than one year that passed between said hearing and the final decision on permanent custody. A shelter care entry "is in no sense dispositive; it is interlocutory in nature, limited in scope and purpose, and temporary in duration. It responds to an emergency—the immediate physical needs of the child—until the court can fully inquire into the facts and decide what is best for the child. A shelter care order is no more than this." *In re Moloney*, 24 Ohio St.3d 22, 25 (1986). In accordance, an argument about a failure to appoint counsel for the shelter care hearing must be accompanied by an assertion of "prejudice deriving from [parent's] lack of counsel at the shelter care hearing." *In re E.T.*, 2006-Ohio-2413, ¶ 87-89 (9th Dist.).

**{¶69}** Notably, there was never a dispute that shelter care was necessary due to the child's birth during the mother's incarceration in a state prison and the lack of placement alternatives. Nor was there a subsequent dispute about the child's dependency status, which was finally adjudicated at a hearing with counsel, before which efforts were made to find willing and approvable family and friends recommended to BCDFJS by the mother as potential placements.

**{¶70}** In arguing prejudice about the lack of counsel at the emergency hearing, the mother simply points to the venue question raised in her first assignment of error. She says this initial proceeding before the court would have been where venue in Belmont County should have been questioned by an attorney. Yet, venue was never raised by either attorney who represented the mother during various subsequent stages below, nor was the lack of counsel at the emergency hearing raised by either counsel, all indicating the venue issue would not have been raised if counsel had been appointed just prior to the emergency shelter care hearing. We rejected the mother's claim that there were venue issues in assignment of error one. The lack of counsel at the emergency shelter care hearing was not prejudicial. This assignment of error is overruled.

ASSIGNMENT OF ERROR FOUR

{¶71} The mother's fourth assignment of error argues:

"THE JUDGMENT OF THE JUVENILE COURT WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE AND WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

{¶72} To terminate parental rights and grant permanent custody to BCDJFS, the juvenile court was required to find by clear and convincing evidence that this would serve as the child's best interest and one of the grounds in (B)(1) apply. R.C. 215.414(B)(1)(a)-(e). "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶73} A parent can raise sufficiency of the evidence and/or weight of the evidence as to the juvenile court's permanent custody decision. *In re Z.C.*, 2023-Ohio-4703, ¶ 18 (where the Supreme Court explained the standard of review is not abuse of discretion when these arguments are made). Sufficiency asks whether the evidence was adequate as a matter of law. *Id.* at ¶ 13, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). In reviewing the sufficiency of the evidence, we view all evidence, including reasonable inferences, in the light most favorable to the party filing the complaint to ascertain whether "any" rational trier of fact could have found the contested item proven by the applicable standard of proof. *State v. Getsy*, 84 Ohio St.3d 180, 193 (1998). Circumstantial evidence inherently possesses the same probative value as direct evidence. *State v. Treesh*, 90 Ohio St.3d 460, 485 (2001).

{¶74} Where an appellant claims the decision is contrary to the manifest weight of the evidence, the appellate court weighs the evidence and all reasonable inferences, considers the credibility of the witnesses, and determines whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created a manifest miscarriage of justice requiring a new trial. *In re Z.C.* at ¶ 14. There is a presumption in favor of the trier of fact, to whom we defer in part because of their superior position from which to view the demeanor, gestures, and voice inflections of the witnesses in order to assess

credibility. *Id.* at ¶ 14, citing *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984) (construing the evidence consistent with the judgment when susceptible to more than one construction). "Although the concepts are different, the finding that a conviction is not against the manifest weight of the evidence necessarily includes a finding of sufficiency." *State v. Boyd*, 2023-Ohio-271, ¶ 23 (7th Dist.).

{¶75} The juvenile court found by clear and convincing evidence permanent custody, "the child cannot be placed with the mother within a reasonable time", citing R.C. 2151.414(B)(1)(a). In making this determination, the court "shall consider all relevant evidence" and "shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent" if the clear and convincing evidence shows the existence of any one of the listed factors in (E), including "[a]ny other factor the court considers relevant." R.C. 2151.414(E)(1)-(16). Although the best interest factors are not at issue on appeal, we note one of the statutory best interest factors asks "[w]hether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child." R.C. 2151.414(D)(1)(e).

{¶76} The court found by clear and convincing evidence the alternative factors in (E)(1), (E)(11), and (E)(13) applied. The mother contests the sufficiency and the weight of the evidence regarding each alternative factor. For instance, (E)(13) applies when "[t]he parent is repeatedly incarcerated, and the repeated incarceration prevents the parent from providing care for the child." The mother points out the record does not mention past incarceration (besides the imprisonment during which she gave birth). As noted in our footnote in assignment of error two, the court's citation to (E)(13) may have been a typographical error with an intent to cite to (E)(12). The latter division was cited in the permanent custody motion and applies when: "The parent is incarcerated at the time of the filing of the motion for permanent custody or the dispositional hearing of the child and will not be available to care for the child for at least eighteen months after the filing of the motion for permanent custody or the dispositional hearing." R.C. 2151.414(E)(12). The mother contends (E)(12) did not apply because by the time the permanent custody motion was filed, she had less than 18 months left on her Belmont County sentence. The juvenile court's footnote pointed to the likelihood of further incarceration due to the pending serious charges in West Virginia. This was reflected in

Ex. D to the motion for permanent custody, and some testimony at the permanent custody hearing opined the pending West Virginia case and risk of incarceration to be a concern. Regardless, this was not the only factor.

**{¶77}** Division (E)(11) applies when: "The parent has had parental rights involuntarily terminated with respect to a sibling of the child pursuant to this section or section 2151.353 or 2151.415 of the Revised Code, or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to those sections, and the parent has failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, the parent can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child." R.C. 2151.414(E)(11). The mother contends there was no showing West Virginia's law is substantially equivalent to Ohio's (without specifically analyzing the contents of the West Virginia disposition entry in Ex. 3). She also complains about the lack of specific findings on this issue or on her burden to prove she could provide adequate care (in the future). *But see* R.C. 2151.414(C) (after the court grants permanent custody, "the court, upon the request of any party, shall file a written opinion setting forth its findings of fact and conclusions of law in relation to the proceeding").

**{¶78}** In any case, as to (E)(11) and (E)(13), the mother mainly relies on her argument in assignment of error two, wherein she contested the propriety of finding a "ground" under (E) (listing factors) where the motion for permanent custody did not mention the information under a specific subdivision in (E). We incorporate our above discussion on that argument. Notably, we cited multiple cases indicating reliance on a ground that was not sufficiently alleged or supported is not dispositive on appeal if another ground was sufficiently alleged and supported. As concluded, if the juvenile court alternatively ruled on a factor that was not supported by the evidence, then there is no prejudice or the issue is moot if *one* of the grounds relied upon by the court was alleged and supported. *See, e.g., In the Matter of A.P.*, 2024-Ohio-741, ¶ 18-19, 43-44, 49, 54-55 (10th Dist.) (sufficiency of the evidence argument on a (B)(1) ground or a factor under (E) is moot and non-prejudicial where an alternative ground was supported or was not challenged).

{¶79} In accordance, if the court's decision on (E)(1) was supported by sufficient evidence and was not contrary to the manifest weight of the evidence, we need not address the arguments on the alternative factors in (E). Division (E)(1) provides:

> Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

R.C. 2151.414(E)(1). Again, the juvenile court *was required* to enter a finding that the child cannot be placed with the mother within a reasonable time (or should not be placed with her) if it found (E)(1) was supported by clear and convincing evidence. R.C. 2151.414(E).

{¶80} The mother relies on a case she says had similar facts regarding a mother who gave birth in prison where the appellate court reversed after reviewing the juvenile court's conclusion on (E)(1). *In re L.H.*, 2024-Ohio-2271, ¶ 48 (8th Dist.). Rather than seek an extension of the temporary custody granted six months earlier, the agency in *L.H.* sought permanent custody in April 2023 with the motion stating the mother's release date was May 2024 and her incarceration interfered with completion of her case plan. *Id.* at ¶ 11. After filing the motion, the agency relocated the child from a foster family to the residence of the mother's brother. *Id.* at ¶ 12. By the time of the December 2023 permanent custody hearing, the mother was living in a halfway house. *Id.* at ¶ 19. The guardian ad litem said there was no bond between the mother and child. *Id.* at ¶ 19. Virtual visits were permitted at the halfway house, but her brother and the agency did not facilitate the process; some virtual visits occurred during her imprisonment, but the prison in Marysville ended the program (sometime before November 2023). *Id.* at ¶ 11, 14-16.

Case No. 25 BE 0013

The mother was on a waitlist for certain programs required by the case plan due to her use of marijuana during pregnancy. *Id.* at ¶ 17. She testified she was being released from the halfway house into house arrest the next month. *Id.* at ¶ 18.

**{¶81}** After the court granted permanent custody to the agency, the mother appealed to the Eighth District raising one assignment of error on the weight of the evidence. *Id.* at ¶ 1. She pointed out time remained after her release from the halfway house for her to comply with the case plan before the expiration of the maximum two-year term of temporary custody provided by statute.[6] *Id.* at ¶ 37. The Eighth District sustained her assignment of error and concluded the weight of the evidence did not support the conclusion by clear and convincing evidence the factor in (E)(1) (notwithstanding the agency's reasonable planning and diligent efforts, the mother failed continuously and repeatedly to substantially remedy the conditions causing placement of the child outside of the home) and thus the manifest weight of the evidence did not support the finding of the ground in (B)(1)(a) (cannot be placed within reasonable time or should not be so placed). *Id.* at ¶ 42, 47.

**{¶82}** The cited *L.H.* case is distinguishable as the mother in said case already successfully earned release into a halfway house, the Eighth District believed she would be released into house arrest within the month, she made appropriate inquires to a housing assistance organization, she visited the child previously, the child was placed with the mother's brother (after originally being placed in foster care), the appellate court was unhappy with the failure of the agency to order the brother to setup virtual visits at the halfway house, and the reports of the mother's drug use only involved marijuana. Regardless, a court's decision to reverse on manifest weight grounds in one case does not support a reversal in another case (even if the cited case had been one from our district). Manifest weight involves the effect of the evidence presented in a particular case in "inducing belief" (i.e., whether the evidence had a persuasive effect); it involves

---

[6] "No court shall grant an agency more than two extensions of temporary custody pursuant to division (D) of this section and the court shall not order an existing temporary custody order to continue beyond two years after the date on which the complaint was filed or the child was first placed into shelter care, whichever date is earlier, regardless of whether any extensions have been previously ordered pursuant to division (D) of this section." R.C. 2151.415(D)(4).

credibility judgments, rather than a holding as a matter of law. *See Thompkins*, 78 Ohio St.3d at 386-387.

{¶83} The juvenile court occupied the best position from which to judge the credibility of the witnesses at the October 2024 permanent custody and weigh the evidence, including reasonable inferences. The court heard the mother testify and could choose to disbelieve her predictions about her future job or housing prospects or preparations and could find her hope for release to a halfway house in January 2025 to be unfounded or naïve under the totality of the circumstances in the case. The mother's official earliest release date was many months away, the end of June 2025 (with good time credit). Her plans were assumptions. She was not able to visit or bond with the child during the 14 months between the agency taking emergency custody (two days after birth) and the permanent custody hearing. The agency allowed her time to attempt to secure a shorter imprisonment by trying for judicial release (the two initial times) or to attempt enrollment in a college program, all to no avail.

{¶84} The child was placed in foster care due to an inability to identify willing or appropriate alternate placements. There was no indication the lack of contact or the placement was due to a failure of BCDJFS, who investigated many families and is not responsible for prison rules on programming or infant visits. The mother did not qualify to keep her infant in prison due to her prior termination of parental rights. At the permanent custody hearing, the caseworkers discussed their meetings with the mother and their multiple attempts to locate a placement for the child under preferences expressed by the mother. Furthermore, the juvenile court previously made reasonable efforts findings throughout the various stages of proceedings. *See In re C.F.*, 2007-Ohio-1104, ¶ 43 ("If the agency has not established that reasonable efforts have been made prior to the hearing on a motion for permanent custody, then it must demonstrate such efforts at that time.").

{¶85} The case plan programming goals were concerned with her parenting skills but also with her legal and drug issues. The mother took multiple parenting classes as required by her case plan, but other case plan goals could not be completed, including an important treatment readiness program. The sentencing court also pointed to drug issues contributing to the offenses that resulted in her incarceration (during which she

possessed methamphetamine) described as part of her pattern of substance abuse, including other drugs as well (not only marijuana). (Ex. 6).

{¶86} As acknowledged by the mother's reliance on hopes for a halfway house, post-release circumstances can be considered. The guardian ad litem expressed concern that the early release date for good time credit could be withdrawn depending on behavior, and even using this date, only a few weeks would remain for reunification before the two-year agency custody time limit. It was also pointed out the mother may be released directly to West Virginia in any event. Her ramming of a police vehicle occurred in that state after the chase in Ohio. *Id.* When ascertaining "the child cannot be placed with [the mother] within a reasonable time," the juvenile court reasonably considered the likelihood the mother would be reincarcerated in West Virginia after her Ohio release due to the charges pending in that state. All factors relevant to the question of whether the child "cannot be placed with [the mother] within a reasonable time" can be considered, whether a consideration is specifically listed in division (E) or not. R.C. 2151.414(E)(16).

{¶87} The evidence, including reasonable inferences, was legally sufficient for some rational finder of fact to decide by clear and convincing evidence that the child cannot be placed with the mother within a reasonable time. The fact that an agency did not immediately seek permanent custody based on a lengthy incarceration does not mean the mother's incarceration should thereafter be treated like a pass on case plan goals or on the consideration of what is a reasonable time in a particular case. On the weight of the evidence, we defer to the fact-finder. The juvenile court did not clearly lose its way in resolving credibility issues or conflicts in evidence so as to create a manifest miscarriage of justice requiring a new trial. This assignment of error is without merit.

ASSIGNMENT OF ERROR FIVE

{¶88} The mother's fifth assignment of error alleges:

"APPELLANT RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL."

{¶89} The right to court-appointed counsel is provided to an indigent parent by statute and rule. R.C. 2151.352; Juv.R. 4(A). It has thus been concluded the standard *Strickland* test for ineffective assistance of counsel applies. *In the Matter of R.M.,* 2019-Ohio-5251, ¶ 44 (7th Dist.). That is, a claim of ineffective assistance of counsel requires a showing of both deficient performance and resulting prejudice. *Strickland*, 466 U.S. at

687. If the performance was not deficient, then there is no need to review for prejudice and vice versa. *State v. Madrigal*, 87 Ohio St.3d 378, 389 (2000).

**{¶90}** In evaluating an alleged deficiency in performance, the court asks whether there was "a substantial violation of any of defense counsel's essential duties to his client" so that "counsel's representation fell below an objective standard of reasonableness." *State v. Bradley*, 42 Ohio St.3d 136, 141-142 (1989), citing *Strickland* at 687-688. Our review is highly deferential to counsel's decisions as there are "countless ways to provide effective assistance in any given case" and there is a strong presumption counsel's conduct was within the wide range of reasonable professional assistance. *Id.* at 142, citing *Strickland* at 689. We refrain from second-guessing the strategic decisions of counsel. *State v. Carter*, 72 Ohio St.3d 545, 558 (1995).

**{¶91}** On the prejudice prong, an appellant must show there is a reasonable probability the result of the proceedings would have been different but for the serious errors committed by counsel. *Id.* at 557-558. Prejudice from defective representation justifies reversal only where the results were unreliable or the proceeding was fundamentally unfair due to the performance of trial counsel. *Id.*, citing *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993). Lesser tests of prejudice have been rejected: "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Bradley* at 142, fn. 1, quoting *Strickland* at 693.

**{¶92}** The mother criticizes her first attorney for trying to convince her to voluntarily relinquish her parental rights in this case (when the case was originally called for the permanent custody hearing). However, providing an opinion to a client about the potential to avoid yet another involuntary termination where the attorney believes the mother has little chance of winning is not deficient performance. Regardless, the court provided the mother with substitute counsel, who engaged in discovery and represented her at the trial.

**{¶93}** The mother also notes her first attorney's failure to raise venue as soon as possible. Yet, substitute counsel, who represented her in the two months before trial and through trial, apparently did not view venue as a valid subject to be raised either. Considering the law set forth in assignment of error one regarding an inmate who gives

birth in prison, a serious error resulting in prejudice did not occur in refraining from raising the issue of venue.

{¶94} The mother additionally says the attorney trying the case should have objected at the permanent custody hearing to any evidence relevant to the factors in division (E) of R.C. 2151.414 that were not specified in the permanent custody motion, alluding to the arguments in assignment of error two. For instance, this would appear to encompass an argument that counsel should have objected to testimony on the prior involuntary termination of her parental rights regarding a different child in order to avoid waiving the argument on the sufficiency of the notice provided by the permanent custody motion. However, all factors are relevant, whether specified in division (E) or not, when considering the applicability of the ground in (B)(1)(a) (cannot be placed with parent within reasonable time or should not be so placed). R.C. 2151.414(E)(16).

{¶95} As set forth above, (E)(11) was cited in the motion for permanent custody, and the subject of her prior termination of parental rights was alleged in the dependency complaint to which the mother entered an admission. As to the West Virginia pending criminal charges, we point out the permanent custody motion discussed this subject while citing (E)(12) (incarceration expected to last 18 months from filing) and included the West Virginia indictment and a judgment entry staying the trial pending her Ohio prison release. We incorporate our analysis from assignment of error two. It was not deficient for counsel to refrain from objecting where she and her client had actual notice and were prepared for the allegations.

{¶96} Next, the mother complains counsel failed to object to an irregular procedure in identifying exhibits. The exhibits were identified by title or characteristics when presented during witness testimony, and the court later put numbers on the exhibits when admitting them into evidence. Counsel need not insist on a precise procedure of identifying exhibits with simultaneous exhibit labeling, especially at a bench trial. Plus, there was no indication of confusion or prejudice on the record.

{¶97} The mother also contends counsel did not effectively cross-examine the witnesses or develop evidence in her favor. In a capital case, the Supreme Court reiterated that trial counsel is not required to cross-examine every witness and it lies within counsel's judgment whether to strategically decide to refrain from cross-examination.

*State v. Grate*, 2020-Ohio-5584, ¶ 148. The mother also complains counsel inadequately developed evidence in her favor and chose not to make a closing argument. However, when the mother testified that permanent custody was in the child's best interest based on the testimony she heard, including the child's connection to his foster brother, it was then reasonable to refrain from reinforcing the admission by continuing to question her. This situation could likewise have impacted any prepared closing argument or otherwise warranted a waiver of a closing argument, especially where the agency's initial closing argument was minimal. In a capital case, the Supreme Court has concluded the waiver of guilty phase closing argument can be viewed as a tactic to avoid a stronger closing rebuttal from opposing counsel. *State v. Hoffner*, 2004-Ohio-3430, ¶ 47.

**{¶98}** In summary, debatable tactics viewed in hindsight do not equate with representation falling below the "wide range of reasonable[ness]." *Carter*, 72 Ohio St.3d at 558. A substantial violation of a duty to the mother has not been established. Counsel did not render deficient performance. Moreover, there is no reasonable probability the result would have been different if the alleged failures raised by the mother now were raised earlier. There is no indication the results were unreliable or the proceeding was "fundamentally unfair" due to the performance of trial counsel. *See id.* Accordingly, the mother's defense was not prejudiced by the assertions set forth herein. This assignment of error is overruled.

ASSIGNMENT OF ERROR SIX

**{¶99}** The mother's sixth and final assignment of error contends:

"AS A RESULT OF CUMULATIVE ERROR, THE JUDGMENT OF THE JUVENILE COURT MUST BE REVERSED."

**{¶100}** The mother broadly cites us to the prior assignments of error and concludes if we find one assignment of error established an error but it was insufficient to require reversal by itself, then its combination with other irregularities would cumulatively rise to the level of reversible error. Under the cumulative error doctrine, a conviction may be reversible when a reviewing court is convinced the cumulative effect of errors in a trial deprived the defendant of a fair trial, even though each instance of error was individually found harmless. *State v. McKelton*, 2016-Ohio-5735, ¶ 321-322 (speaking of "trial-court error" occurring "at . . . trial").

**{¶101}** A cumulative error analysis cannot be commenced if there were not multiple instances of error that were individually found harmless. *State v. Hunter*, 2011-Ohio-6524, ¶ 132. Multiple errors have not been established in this case, whether viewing the decisions made by the trial court or those made by counsel and whether considering occurrences during trial or throughout the entire case.

**{¶102}** Furthermore, even if a court finds multiple instances of harmless error, those harmless errors "cannot become prejudicial by sheer weight of numbers." *McKelton* at ¶ 322, quoting *State v. Hill*, 75 Ohio St.3d 195, 212 (1996). Even assuming arguendo more than one contention raised could be considered to constitute an error, there was no indication any such instances could combine to cause reversible prejudice in this *bench trial* and under the circumstances of the case.

**{¶103}** "[T]here can be no such thing as an error-free, perfect trial, and . . . the Constitution does not guarantee such a trial." *Hill* at 212, quoting *U.S. v. Hasting*, 461 U.S. 499, 508-509 (1983). Appellant received a fair trial. This assignment of error is overruled.

**{¶104}** For the foregoing reasons, the juvenile court's judgment granting permanent custody of the child to BCDJFS is affirmed.


Waite, J., concurs.

Dickey, J., concurs.

---

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas, Juvenile Division of Belmont County, Ohio, is affirmed.  Costs waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**