[Cite as *In re M.B.*, 2025-Ohio-4837.]

# IN THE COURT OF APPEALS OF OHIO

SEVENTH APPELLATE DISTRICT
BELMONT COUNTY

IN RE:  M.B.,

ABUSED AND DEPENDENT CHILD.

---

### OPINION AND JUDGMENT ENTRY
### Case No. 25 BE 0041

---

Juvenile Appeal from the
Common Pleas, Juvenile Division of Belmont County, Ohio
Case No.  24 JC 226

**BEFORE:**
Carol Ann Robb, Cheryl L. Waite, Katelyn Dickey, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. J. Kevin Flanagan,* Belmont County Prosecutor*, Atty. Jacob A. Manning,* Assistant Prosecuting Attorney, for Appellee and

*Atty. Christopher P. Lacich*, Roth, Blair, for Appellant.

Dated:  October 22, 2025

**Robb, P.J.**

{¶1} Appellant (the father) appeals the judgment of the Belmont County Common Pleas Court, Juvenile Division, terminating his parental rights and granting permanent custody of M.B. (the child) to Appellee Belmont County Department of Job and Family Services, Children Services Division (the agency). The mother permanently surrendered her parental rights after reunification efforts failed while she was working a case plan, all while the father was serving a lengthy prison term in another state. The father argues the permanent custody decision excluding him from participation in the child's future was not sufficiently supported by clear and convincing evidence and was contrary to the manifest weight of the evidence. For the following reasons, the juvenile court's judgment is affirmed.

STATEMENT OF THE CASE

{¶2} On April 23, 2024, the agency filed a complaint alleging the seven-year-old child was abused and dependent. According to the attested allegations in the complaint, the child was removed from the mother's house and placed with foster parents upon the child's April 22, 2024 disclosure of sexual abuse by her stepfather. When interviewed at school, the child said her mother told her not to speak about it. As to a prior similar report, the child explained she did not maintain her disclosure to the prior caseworker because her mother was present at the interview. On the day of the latest disclosure when the caseworker arrived at the house, the mother threatened to fight the caseworker and refused to allow the caseworker to speak privately with the child's sister, who was reported to be a witness. (4/24/24 Tr. 4-6).

{¶3} In the complaint, the agency also attested to making reasonable efforts to prevent removal of the child including case management, referrals, and kinship investigation. The docket shows notice of the complaint was sent to the mother at her Martins Ferry, Ohio address and to the father at a West Virginia prison.

{¶4} The juvenile court held an emergency shelter care hearing the next day. The mother appeared and said she had no family or friends to recommend for placement for the child. *Id.* at 15. When asked if she receives any money from the father's jail wages, the mother replied, "He doesn't do nothing for her. He's never had nothing to do

with her." *Id.* at 22. The caseworker testified about the child's disclosure that her stepfather "touches" her vaginal area and that she previously told her mother (and others) but they told her not to talk about it. *Id.* at 18. The caseworker said the 2022 investigation of the stepfather's conduct with this child (and the child's sister) resulted in the case being closed after he left the home; however, he later returned. *Id.* at 20.

{¶5} The juvenile court found the agency made reasonable efforts to prevent removal of the child and concluded continued emergency shelter care was necessary. *Id.* at 21-22. The court appointed a guardian ad litem who filed a report. The court additionally appointed an attorney to represent the child. An attorney was appointed for the mother and subsequently for the father.

{¶6} The father's name was not on the child's birth certificate, and he requested paternity testing. The court granted the request, and the testing verified the father's paternity of the child. (5/9/24 J.E.); (7/25/24 J.E.).

{¶7} At the adjudicatory hearing, the mother was present, and the father appeared remotely from prison in West Virginia. The DNA results had not yet been returned, but the father and his attorney said they had no objection to the adjudicatory hearing proceeding before the results were returned. (7/12/24 Tr. 4-6). The father told the court he had five years until he would be eligible to seek parole. *Id.* at 6. The court considered the allegations in the affidavit attached to the complaint after the mother's attorney secured the removal of an allegation about a video being shown to the mother. *Id.* at 8.

{¶8} Upon adjudicating the child abused and dependent, the juvenile court granted temporary custody to the agency as recommended by the guardian ad litem. The court found the agency made reasonable efforts to prevent or eliminate the child's removal from the home, including seeking kinship placement, case planning, referrals, and foster care with a nearby family. (7/15/24 J.E.).

{¶9} Case plan hearings and review hearings were thereafter held. An initial case plan pointed out the mother provided no names for kinship placement. At the first hearing after adjudication, the father's attorney noted the father asked the agency to consider his family for kinship placement; specifics were not disclosed, and counsel indicated a belief the agency investigated the request. (8/23/24 Tr. 4). The next case

plan reported there were no relatives available or appropriate but kinship placement remained open for recommendations.

**{¶10}** At the hearing related to that plan, the caseworker said the father asked to speak with the child through prison calls; she considered this request and conferred with the child's therapist. In the end, they believed this would be detrimental to the child's progress working on the serious issues she was experiencing. The court voiced agreement with this assessment. (10/9/24 Tr. 7-9). The court found the agency was making reasonable efforts to prevent the child's continued removal, reiterating items such as case plan services and management, referrals, counseling, and nearby foster family placement. (10/9/24 J.E.).

**{¶11}** At a subsequent hearing, the caseworker and the foster parent spoke about the child's severe increase in anxiety after being told family therapy with the mother would start and after the mother mentioned the visitation locations may be changing to the mother's home. (1/15/25 Tr. 4-10). It was reported the mother missed some counseling appointments, and the court granted a request to add parenting classes to the case plan. *Id.* at 5, 12. The agency's reasonable efforts were again set forth. (1/15/25 J.E.). Subsequently, the father's attorney said she had no objection to the amended case plan, including the fact that the father was not offered services in it due to his incarceration. (2/26/25 Tr. 3-4).

**{¶12}** On March 18, 2025, the agency moved to extend temporary custody. At the hearing on the motion, the agency voiced a plan to allow further counseling and services. The caseworker pointed out the child was still experiencing severe anxiety about visits with the mother and was not ready for family therapy. *Id.* at 4-7, 12. The foster mother confirmed the child's troubles. *Id.* at 9. There was a discussion of an investigation of new disclosures. *Id.* at 5-7, 11. The caseworker reported the mother still had no recommendation for kinship placement. She said she would investigate any potential placement if the father provided names and noted he has not contacted her in months. The court was informed the mother reported the father threatened her from prison. *Id.* at 8. The father's attorney also noted the father initially called her regularly and then stopped communicating with her. (4/9/25 Tr. 10).

**{¶13}** In the resulting April 9, 2025 order, the court granted the motion to extend temporary custody, noting no party objected to the extension. The court again found the agency made reasonable efforts to prevent the need for the child's removal from the home and reiterated those efforts (including foster care with a nearby family, counseling, case management and case plan services, referrals, family team meetings, quarterly reviews, and semi-annual reviews.)[1] The next review hearing was set for July 2, 2025.

**{¶14}** At an intervening case plan hearing, it was pointed out the agency sent an updated case plan to the father in prison requesting his signature but he did not respond. This case plan showed the concurrent plan (concurrent to the reunification plan) was being amended from kinship placement to adoption. The father's attorney said she had no objection to the court adopting the case plan. (6/18/25 Tr. 3). The case plan was approved. (6/18/25 J.E.).

**{¶15}** The agency then filed a motion for court approval of the mother's permanent surrender of the child. On the same day, June 24, 2025, the agency filed a motion for permanent custody and termination of the father's parental rights.

**{¶16}** With regards to the mother's parental rights, the agency pointed out the mother met with the agency on June 16, 2025 to discuss her voluntary surrender decision and received birth parent counseling. The court ensured the mother understood the rights she was waiving. (7/2/25 Tr. 28-29). The mother agreed permanent custody was in the child's best interest and signed the permanent surrender form before the court. *Id.* at 30. The court approved the mother's surrender of parental rights and terminated them, finding by clear and convincing evidence the mother failed, continuously and repeatedly for more than six months, to substantially remedy the condition that caused the child to be placed

---

[1] As reviewed above, reasonable efforts findings were made at each stage through the extension of temporary custody as required by R.C. 2151.419(A)(1) (the court shall determine whether the agency made reasonable efforts to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home). As the Supreme Court observed, this provision applies only to certain proceedings occurring prior to a permanent custody hearing. *In re C.F.*, 2007-Ohio-1104, ¶ 43. Also, temporary custody orders after an adjudication are final appealable orders that must be challenged when issued. *In re Murray*, 52 Ohio St.3d 155, 161 (1990).

outside the home, despite reasonable case planning and diligent efforts by the agency to assist the mother in remedying the problems. *Id.* at 31; (7/2/25 J.E.).

{¶17} With regards to the father's parental rights, the agency argued permanent custody was in the child's best interest and the child has been in the temporary custody of the agency for 12 or more months of a consecutive 22-month period satisfying the ground in R.C. 2151.414(B)(1)(d). As an alternative ground, the agency alleged the child cannot be placed with the father within a reasonable time and should never be placed with him, citing R.C. 2151.414(B)(1)(a). The motion pointed out the father was incarcerated in West Virginia for most of the child's life and his next parole date was beyond a proper period for working on reunification. It was alleged multiple of his child abuse offenses fell under R.C. 2151.414(E)(7). The motion also discussed reasonable efforts such as case management, case plan services, reviews, referrals to community resources and providers such as mental health counseling, kinship search and engagement, foster care placement, and family team meetings. The child's progress in foster care and at counseling was further noted.

{¶18} An exhibit to the complaint contained information on the father's criminal charges resulting in the father's incarceration. The first page was the prison print out showing a projected release date in 2047 but a parole hearing in August 2029, listing his offense categories as: "Child Abuse By Parent W/ Serious Bodily Injury"; "Child Abuse With Risk Of Serious Bodily Inj[ury] or Death"; and "Child Abuse By Parents Resulting In Injury." This exhibit also contained the father's April 18, 2018 plea and sentencing order from the West Virginia court showing he pled guilty to ten felony child abuse offenses and was sentenced to 2 to 10 years on each of the two counts of child abuse resulting in serious injury; 1 to 5 years on each of the four counts of child abuse resulting in injury; and 1 to 5 years on each of the four counts of child abuse creating a substantial risk of death or serious bodily injury. The sentences were ordered to run consecutively for an aggregate sentence of 12 to 60 years in prison, with an effective date of August 25, 2017. The order also advised the father of his obligation to register with the West Virginia Child Abuse and Neglect Registration.

{¶19} This plea and sentencing order was admitted as an exhibit at the permanent custody hearing, where the father appeared remotely and his attorney appeared live in

the courtroom. The caseworker testified she had phone contact with the father multiple times and they spoke about the mother's reunification plan. She explained the father was not provided services in the case plan because he would be incarcerated in a West Virginia prison for several years, and she opined there was no possibility for him to work a reunification plan with the child. (7/2/25 Tr. 9, 13). The caseworker reviewed the language of the conviction order on the ten felonies, pointed to the consecutive nature of the father's sentences for a total term of 12 to 60 years in prison, and opined it was likely the child, who was eight years old at the time of the hearing, would reach adulthood before the father was released from prison. *Id.* at 10-13. (Ex. A). She concluded a grant of permanent custody to the agency was in the child's best interest. *Id.* at 15.

{¶20} The guardian ad litem testified the father did not contact him upon his request made to the prison. *Id.* at 16. He recommended the court grant permanent custody to the agency, opining it was in the child's best interest. He pointed out the father cannot participate in the child's life and was incarcerated for "heinous" crimes against children. *Id.* at 17.

{¶21} Next, the child's attorney explained it was her duty to advocate for the child's wishes. *Id.* at 18. She spoke to the child about the situation and concluded it was in the child's best interest for the court to accept the mother's permanent surrender and terminate the father's parental right by granting permanent custody of the child to the agency. *Id.* at 19.

{¶22} The father testified he had conversations with the agency about his difficulties in regards to reunification. When asked whether he continued to stay in contact with the agency, his answer was confusing: "I haven't recently because I went through a state of almost a month calling daily with no ability of answering." *Id.* at 21. The father also suggested he was awaiting court decisions in his criminal case and confusingly claimed, "I have a written statement of the prime witness as what has -- any medical of the injuries and the original statement." The father said he would be eligible for a parole hearing in August 2029. *Id.* at 22. When asked what his plans were if he were released, he said he wished to have contact with the child and would follow any recommendations of her custodian to form a relationship with the child so he was not a "complete stranger." He indicated he last saw the child before he was arrested when she was approximately

five months old (in 2017). He said he made phone and video calls, arranged through the child's mother when he could afford it, in the year 2023 until the last contact occurring at Thanksgiving 2023. *Id.* at 22-24.

**{¶23}** In closing, the father's attorney reiterated the father's hope to challenge his criminal case and pointed out the child would only be 12 years old if the father were granted parole when first eligible in four years, which could provide time to establish a relationship. The court took the matter under advisement.

**{¶24}** On July 15, 2025, the juvenile court granted permanent custody to the agency. The court observed the child had been in the agency's temporary custody for 12 of the last 22 months at the time the motion was filed and cited R.C. 2151.414(B)(1)(d). The court alternatively found the child cannot and should not be placed with the father based on findings made under (E)(7) (conviction of child endangering regarding child in household) and (E)(12) (incarceration renders parent unavailable for at least 18 months). The court also found by clear and convincing evidence it was in the child's best interest to grant permanent custody to the agency and set forth various best interest factors that were taken into consideration.

**{¶25}** The judgment entry noted the father was not included in the case plan due to his prolonged incarceration resulting from his 10 West Virginia felony convictions of crimes against children with a total sentence of 12 to 60 years in prison, emphasizing some offenses resulted in injury to a child and some resulted in serious injury to a child. It was pointed out the child would be an adult by the time the father's minimum sentence expires. Acknowledging the father's potential parole eligibility date was August 2029, the court found (even if he obtained parole on his first try) this would still be too late to work a reunification plan.

**{¶26}** On August 13, 2025, the father filed a timely notice of appeal of the juvenile court's judgment, resulting in this expedited appellate case. Counsel was appointed for the father whose brief was filed on September 8, 2025. The agency's brief was filed September 29, 2025, and the case was scheduled for the court's conference on October 15, 2025.

ASSIGNMENT OF ERROR

**{¶27}** The father's assignment of error contends:

Case No. 25 BE 0041

"THE JUVENILE COURT COMMITED REVERSIBLE ERROR WHEN IT GRANTED THE BCDJFS' MOTION FOR PERMANENT CUSTODY OF M.B., FOR NO EFFORT WAS MADE TO INCLUDE NATURAL FATHER IN M.B.'S LIFE IN THE FUTURE, AND THUS, THE SAME WAS NOT BASED ON CLEAR AND CONVINCING EVIDENCE AND/OR AGAINST THE MANIFEST WEIGHT OF EVIDENCE."

{¶28}  After a hearing on a permanent custody motion, the juvenile court employs a two-prong test and may grant permanent custody of a child to the agency if the court determines by clear and convincing evidence it is in the best interest of the child to grant permanent custody of the child to the agency and at least one of the five alternative grounds listed in R.C. 2151.414(B)(1) exist.   Clear and convincing evidence is the measure of proof producing in the fact-finder's mind "a firm belief or conviction as to the facts sought to be established."  *In re Z.C.,* 2023-Ohio-4703, ¶ 7 (more than a mere preponderance of the evidence but less than the criminal standard of beyond a reasonable doubt), quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.  Circumstantial evidence inherently possesses the same probative value as direct evidence. *State v. Treesh*, 90 Ohio St.3d 460, 485 (2001).

{¶29}  Appellant emphasizes the termination of a parent's basic civil right to his child is considered the family law equivalent of the death penalty and should be imposed only as a last resort.  *See In re Hayes*, 79 Ohio St.3d 46, 48 (1997).  He points out the Ohio Supreme Court has clarified that the juvenile court's decision evaluating the evidence at a permanent custody hearing can be reviewed by the appellate court under sufficiency and weight of the evidence standards of review.  *Z.C.* at ¶ 18 (rather than an abuse of discretion standard).  Sufficiency of the evidence and weight of the evidence are distinct concepts that are quantitatively and qualitatively different.  *Id.* at ¶ 13 citing *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 10 (applying the distinctions in *Thompkins* to civil cases), citing *State v. Thompkins*, 78 Ohio St.3d 380 (1997), paragraph two of the syllabus.

{¶30}  Sufficiency is a question of law on the adequacy of the evidence.  *Id.*  In reviewing the sufficiency of the evidence, the court views the evidence, including reasonable inferences, in the light most favorable to the party bringing the action (here the agency) to ascertain whether any rational trier of fact could have found the elements proven by the applicable standard (here clear and convincing evidence).  See, e.g., State

Case No. 25 BE 0041

v. Goff, 82 Ohio St.3d 123, 138 (1998); *State v. Filiaggi*, 86 Ohio St.3d 230, 247 (1999); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Sufficiency involves the burden of production rather than the burden of persuasion involved in evaluating the weight of the evidence. See Thompkins at 390 (Cook, J., concurring).

**{¶31}** Distinctly, in reviewing the manifest weight of the evidence, "the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *Z.C.* at ¶ 14. We defer to the findings of the trial judge who occupied the best position to gauge the witnesses while observing demeanor, gestures, and voice inflections. *Id.*, citing *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). The reviewing court must maintain the trial court's judgment if the evidence is reasonably susceptible of more than one construction. *Id.* Our "discretionary power" in reversing on the weight of the evidence can be employed "only in the exceptional case" where the evidence "weighs heavily against the" judgment on review. *Thompkins* at 387.

**{¶32}** Under the first prong of the permanent custody test, the fourth statutory ground, known as the "12 of 22" provision applies when: "The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period . . ." R.C. 2151.414(B)(1)(d). This division contains a special definition of temporary custody: "a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28 of the Revised Code or the date that is sixty days after the removal of the child from home." R.C. 2151.414(B)(1).

**{¶33}** The child was removed from the home on April 22, 2024, and satisfying the first prong of the test, the motion was filed on June 24, 2025. Appellant does not dispute the record before this court mathematically established the 12 of 22 provision applied at the time the permanent custody motion was filed and thus the ground in (B)(1)(d) existed, which allowed the juvenile court to move to the best interest prong of the permanent custody test. R.C. 2151.414(B)(1). See, e.g., *In re C.W.*, 2004-Ohio-6411, ¶ 21-26

Case No. 25 BE 0041

(where the Supreme Court explained after the enactment of the "12 of 22" provision, the agency is no longer required to prove a child cannot be returned to the parents within a reasonable time or should not be returned to the parents if the child was in temporary custody for 12 months when the permanent custody was filed); *In re B.G*., 2020-Ohio-1414, ¶ 49-55 (6th Dist.) (the juvenile court's own docket in the case at bar can provide clear and convincing evidence of the dispositional timeline); *In re M.H.,* 2012-Ohio-1561, ¶ 20 (5th Dist.) (the juvenile court is permitted to take notice of its own docket in the subject case in calculating the 12 of 22 ground), citing *Indus. Risk Insurers v. Lorenz Equip. Co*., 69 Ohio St.3d 576, 580 (1994).

{¶34} We additionally point out even where the child "has not been in the temporary custody" for the requisite time, an alternative ground can be applied if the court finds by clear and convincing evidence "the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents."  R.C. 2151.414(B)(1)(a).  In determining whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, if the court determines by clear and convincing evidence that any item listed under division (E) exists, then "the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent."  R.C. 2151.414(E). The juvenile court specifically found clear and convincing evidence of both (E)(7) and (E)(12).[2]

{¶35}  Subdivision (E)(12) applies when:  "The parent is incarcerated at the time of the filing of the motion for permanent custody or the dispositional hearing of the child and will not be available to care for the child for at least eighteen months after the filing of the motion for permanent custody or the dispositional hearing."  R.C. 2151.414(E)(12). There was clear and convincing evidence presented by the agency on this finding, which mandated the conclusion on the existence of the ground in (B)(1)(a) ("the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents").

---

[2] We also note the court may make a finding under the (B)(1)(a) ground even in the absence of the (E)(1) through (15) specifically described factors.  *See* R.C. 2151.414(E) ("shall consider all relevant evidence"), (16) ("[a]ny other factor the court considers relevant")

Case No. 25 BE 0041

**{¶36}** That is, the agency sufficiently provided evidence from which to firmly believe the father would be incarcerated for many years; even his first eligible parole date was well over 18 months from the hearing date. The finding was supported by the weight of the evidence, including Appellant's own testimony on his hopes for parole. Appellant's plan to seek reversal of his many convictions was not one the juvenile court lost its way in doubting. The undisputed existence of satisfactory evidence regarding one ground under (B)(1) makes a dispute about another ground moot or non-prejudicial. *See In re J.H.*, 2025-Ohio-2380, ¶ 56 (7th Dist.).

**{¶37}** As yet another alternative, the additionally cited subdivision (E)(7) relates to a parent's conviction of certain crimes where the victim was the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense. R.C. 2151.414(E)(7). This subdivision is not only listed in the statute as a reason mandating a finding of the (B)(1)(a) ground, it is also provided as a best interest factor, as discussed next. R.C. 2151.414(B)(1)(a), (D)(1)(e). Incorporating our Statement of the Case above detailing the evidence on Appellant's convictions in West Virginia, we observe there was proof from which some rational trier of fact could firmly believe (E)(7) applied and such conclusion was not contrary to the manifest weight of the evidence. *See* 2151.414(E)(7)(b), citing R.C. 2903.11 (felonious assault, which includes a definition of knowingly causing serious physical harm to another) and R.C. 2903.13 (assault, which is defined either as knowingly causing or attempting to cause physical harm or as recklessly causing serious physical harm another); *see also* R.C. 2141.414(E)(7)(c), citing R.C. 2919.22(B)(2) (child endangering by torturing or cruelly abusing a child). Regardless, as set forth above, the child was in temporary custody for over 12 months straight and alternatively (E)(12) clearly applied.

**{¶38}** Moving to the second prong of the permanent custody test, the juvenile court explained the application of the best interest factors in R.C. 2141.414(D)(1). As noted in the prior paragraph, the juvenile court found one or more of the father's West Virginia convictions was substantially equivalent to a relevant Ohio offense and involved a child who lived in his household at the time (and/or was a sibling of the child at issue). *See* R.C. 2151.414(D)(1)(e), citing (E)(7). In any event, "the court shall consider all relevant factors, including, but not limited to" those listed in (D)(1)(a)-(e) when evaluating

a child's best interest, and thus, all of the father's convictions could be considered when weighing the best interest factors. R.C. 2151.414(D)(1).

{¶39} Moreover, the evidence showed his 2018 West Virginia convictions carried a total sentence of 12 to 60 years in prison. The juvenile court observed this prolonged West Virginia incarceration prevented him from interacting with or developing a relationship with the child. *See* R.C. 2151.414(D)(1)(a). The father testified he last saw the eight-year-old child when she was five months old (in 2017). It was also pointed out the father would not be able to accomplish reunification within appropriate timeframes due to his incarceration. The juvenile court cited the child's custodial history, including more than 12 months in the agency's temporary custody. *See* R.C. 2151.414(D)(1)(c).[3] The court opined the child "had not been in her father's custody for quite some time, if ever, in her life." The court additionally observed the mother surrendered her parental rights and the child's needs were being met in foster care. *See* R.C. 2151.414(D)(1)(a). As an additional best interest factor, the juvenile court concluded the child had a definite need for a legally secure permanent placement, which could not be achieved without a grant of permanent custody to the agency. *See* R.C. 2151.414(D)(1)(d). Finally, the guardian ad litem, the child's counsel, and the caseworker opined permanent custody was in the child's best interest. *See* R.C. 2151.414(D)(1)(b).

{¶40} Viewing the evidence in the light most favorable to the agency, we cannot legally conclude that "no rational trier of fact" could have found the agency met its burden of producing clear and convincing evidence in support of granting permanent custody to the agency. *See Jackson*, 443 U.S. at 319. Rather, a rational fact-finder could firmly believe the child was in the custody of the agency for the 12 months preceding the filing of the motion for permanent custody and permanent custody was in the child's best interest. The juvenile court's decision to terminate father's parental rights was supported by sufficient evidence.

---

[3]As in division (B)(1), division (D)(1) likewise states the temporary custody count begins 60 days after removal, if this date is earlier than the adjudication date. R.C. 2151.414(D)(1). Unlike the first prong of permanent custody on the 12 of 22 provision, the Supreme Court did not declare the motion date a parameter limiting the best interest factors. *See C.W.*, 2004-Ohio-6411, at ¶ 21-26 (holding the motion date applies to the "12 of 22" provision and the agency can still move for permanent custody earlier under a different first prong option); *see also In re L.P.*, 2021-Ohio-3183, ¶ 26 (9th Dist.) (best interest evaluation can consider the post-motion situation and events).

**{¶41}** Contrary to the father's suggestion on appeal, the juvenile court did not err in failing to issue a ruling that would allow him future contact with child.  The court heard his testimony on his hopes in his criminal case, his apparent optimism about his first parole hearing (which was still four years in the future), and his desire to speak to the child from prison (if he could afford it) or after his release (on a sentence of 12 to 60 years).  The father testified he last spoke to the child around Thanksgiving of 2023 and claimed he spoke to her other times that year (when he could afford to do so).  He did not mention phone contact in earlier years.  In any case, the court was not required to believe his testimony; his credibility was for the juvenile court who could evaluate his demeanor as he spoke.  Even under his testimony, he last spoke to the child five months before her removal from the mother's home.

**{¶42}** Upon considering all of the evidence and testimony, including that of the father, we cannot find the juvenile court clearly lost its way and created a manifest miscarriage of justice in weighing the evidence.  The decision to terminate his parental rights was not contrary to the manifest weight of the evidence.  Foster care is not intended to be a long-term placeholder; the child was in dire need of a legally secure placement and deserved a chance at adoption.  This incarcerated father's "genuine desire" to maintain a relationship with his child does not make this an exceptional case or outweigh the negative aspect of this child's continued transient status or the child's best interest, which overwhelmingly favored the grant of permanent custody to the agency.  *See* generally R.C. 2151.414(C) ("shall not consider the effect the granting of permanent custody to the agency would have upon any parent of the child").

**{¶43}** Accordingly, the father's assignment of error is overruled, and the judgment is affirmed.


Waite, J., concurs.

Dickey, J., concurs.


Case No. 25 BE 0041

_____

For the reasons stated in the Opinion rendered herein, the assignment of error is overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas, Juvenile Division of Belmont County, Ohio, is affirmed.  Costs waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**